ESTATE OF RITTER: RITTER (Robert), Appellant, v.
RITTER (Augusta) and others, Respondents.

*No. 333. Argued June 6, 1969.—Decided June 27, 1969.*
(Also reported in 168 N. W. 2d 588.)

For the appellant there was a brief and oral argument by *Herman M. Knoeller* of Milwaukee.

For the respondents there was a brief by *Orth, Riedl & Orth* of Milwaukee, attorneys, for Augusta Ritter, Clarence C. Weinheimer, and Robert Oelstrom, and by *Petrie,*

*Stocking, Meixner & Zeisig* of Milwaukee, of counsel, and attorneys for Frank C. Ritter, and by *Ralph W. Raasch* of Milwaukee, guardian *ad litem* for Merry C., Richard C., and Nancy Ann Ritter, and oral argument by *Charles A. Orth, Jr.*, and *Lewis A. Stocking*.

CONNOR T. HANSEN, J. It is well established that in order to void a will because of undue influence, the objector must prove four elements:

*Susceptibility*—a person who is susceptible of being unduly influenced by the person charged with exercising undue influence.

*Opportunity*—the opportunity of the person charged to exercise such influence on the susceptible person to procure the improper favor.

*Disposition*—a disposition on the part of the party charged to influence unduly such susceptible person for the purpose of procuring an improper favor either for himself or another.

*Coveted Result*—a result caused by, or the effect of, such undue influence. *See Estate of Brehmer* (1969), 41 Wis. 2d 349, 351, 164 N. W. 2d 318.

" '. . . the gist of the attack upon the will is fraud, and the rule applies that, he who alleges fraud must establish it, not by a mere prepondance of, but by clear and satisfactory evidence, . . .' *Ball v. Boston* (1913), 153 Wis. 27, 35, 141 N. W. 8." *Estate of Brehmer, supra*, 351.

The burden is upon the objector to prove by clear, satisfactory and convincing evidence that the will was a result of undue influence. However, in recognition of the difficulty of proving undue influence an additional rule is applicable. When three of the four elements are established by the required proof, only slight evidence as to the fourth element is necessary to prove its existence. *Estate of Brehmer, supra*, 351, 352.

The determination by the county court that the will of Walter Ritter was not the result of undue influence is not contrary to the great weight and clear preponderance of the evidence.

The testator died April 21, 1968, at the age of seventy-one. He was married twice. His first wife passed away in 1964. One child was born of this marriage; Robert C., the objector, who was forty-eight years of age at the time the will was offered for probate. The testator was also survived by his second wife, Augusta, whom he married in March, 1967.

One week before the second marriage, decedent and Augusta entered into an antenuptial contract. Essentially this agreement vested in each party their respective property. Decedent agreed to execute a will leaving $25,000 in a testamentary trust to Augusta, payable to her at the rate of $200 a month until her death or remarriage.

The last will, the one that has been admitted to probate, was executed on March 7, 1968, and after making several specific bequests provided a $25,000 trust to Augusta per the antenuptial agreement. In addition, Augusta is given the right to live in the residence for life or until she remarries or vacates, and the expenses of maintenance, taxes and utilities are to be paid by the trustees of her trust.

The residue of the estate, including any sums which may be payable from Augusta's trust if it be terminated, is assigned to a trust for Robert, his wife, his children and grandchildren, for purposes detailed in the will.

Decedent had executed a prior will on April 6, 1967. It contained specific bequests, including a trust for Augusta similar to that set forth in the 1968 will; however, Augusta did not receive an interest in the residence. The residue was assigned to Robert and in the event Robert predeceased the testator, the residue was assigned to a trust for Robert's children. Under the terms of the

1967 will, Robert, therefore, took outright should the testator predecease Robert.

The 1967 will nominated Clarence Weinheimer and Robert as coexecutors, and Weinheimer and Rudy Wagner as cotrustees. The 1968 will nominated Robert Oelstrom and Weinheimer as coexecutors and cotrustees.

The appellant contends that Augusta Ritter, the proponent, and Clarence Weinheimer, the nominated coexecutor, exercised undue influence upon the testator. The trial court found that while the requisite opportunity was present, the required quantum of evidence to establish the other elements was absent.

*Susceptibility.*

The record contains extensive testimony concerning the failing health of the decedent in an attempt to establish that the decedent was susceptible to undue influence. However, much of this testimony was to the effect that the decedent was a man of strong will and character.

The testator nurtured a successful funeral business which was a source of employment and affluence not only for Robert, but for the decedent's brothers, Frank and Arnold. In 1954, the funeral home was incorporated, and of the 10,000 outstanding shares of stock the decedent controlled 4,000, Robert 3,000 and Frank and Arnold 1,500 shares each.

For many years, the decedent had taken annual physical checkups. In a report of October, 1967, from his doctor, there were a number of negative physical findings but nothing with respect to any mental debility.

In the middle of February, 1968, decedent experienced substantial physical discomfort at times. On March 23, 1968, approximately two weeks after the last will was executed, decedent entered a hospital with complaints of pain. On April 11, 1968, an exploratory laparotomy was

performed which revealed a liver cancer. Ritter died April 21, 1968.

Dr. Fritz, who was the decedent's physician for eight years and who examined him before and after the will was executed, testified that in his opinion the decedent was "a rather strong-willed, very positive person. It was my impression of him that he was very direct in his thinking." Dr. Fritz opined that the decedent was not subject to the "blandishments of other individuals."

There is considerable testimony in the record that the decedent's physical condition was declining during the last two months of his life. He suffered pain in the right upper quadrant which sometimes radiated through the right flank and right back, his legs were getting weak, he looked tired and dejected and his ankles were swollen. There is also some testimony that he was not as mentally alert as he had been.

While illness and hospitalization may be indicative of susceptibility, *Estate of Culver* (1964), 22 Wis. 2d 665, 671, 126 N. W. 2d 536, it is certainly not the sole criterion. In the *Estate of Culver,* the decedent's mental condition had deteriorated excessively. There is no such showing in this case.

It is significant to consider the condition of the decedent at the time the will was executed. Roene Van Roo testified that when she arrived at the home of Walter Ritter to be a witness to the 1968 will, Ritter stated that he wanted to make some changes in his will and that on that date Ritter was of sound mind, memory and understanding. She noted that Ritter had slowed down a little and looked more tired, "but still, as a man of 71, in my opinion, he was very alert and active."

After executing the will the testator took the witnesses, Roene and Raymond Van Roo upstairs to show them how he and his wife were redecorating their home. Mr. and Mrs. Van Roo had both been employees of the Ritter Funeral Home for over twenty years.

On the evening before the will was executed, the decedent chaired a lodge meeting. Edward Brikner was acquainted with the decedent for eighteen years, saw him at least two or three times a month, and attended the lodge meeting on March 6, 1968. He testified that he noticed no difference in Ritter's capabilities in handling the meeting compared to the January and February meetings. Immediately following that meeting another meeting was held concerning the purchase of a lot for the lodge. Ritter twice got up and stated his point of view. His point of view was not contradictory to the position of other people at the meeting; "It was more explanatory." Brikner was of the opinion that from his observations of Walter Ritter at these meetings, he did not believe he could be influenced at any time. "[W]hen he made up his mind about certain things, why that's the way it was."

Frank King, the president of a Cadillac dealership in Milwaukee, knew and had done business with Ritter for forty years. He testified that Walter Ritter was a very good businessman. That opinion was not changed between January and March, 1968. King delivered a Cadillac limousine to Ritter the day after the will was executed. The limousine was delivered with a radio which had not been ordered and Walter Ritter definitely would not take the limousine with the radio. King had to order a new car out because the car was not acceptable with the installed radio. That evening King took Mr. and Mrs. Ritter to dinner on his invitation, at which time "He seemed to be all right." Mr. Ritter drove King's car and carried on conversation that evening.

Elizabeth Johnson, an interior designer, knew the decedent for thirty years. She was in the process of redecorating the Ritter home before his death. She was of the opinion that Walter Ritter could not be influenced.

Other witnesses also testified as to Walter Ritter's strong will. It is also apparent that Ritter continued to

conduct business, though less actively, during the months prior to his hospitalization. He supervised three funerals in March.

The record will not support a finding that even slight evidence of Walter Ritter's susceptibility to undue influence was established.

### *Opportunity.*

There is little doubt that the relationship between the testator and his wife and between the testator and Clarence Weinheimer afforded them an opportunity to unduly influence the decedent. Walter and Augusta lived together and she testified that he spent more time at home than usual in January, February and March, 1968. Clarence Weinheimer testified that he had known the deceased for twenty-five years, worked in close association with him for a good number of years at the Ritter Funeral Home, and occupied a position of trust and confidence with him.

Such relationships adequately support the trial court's finding of sufficient opportunity to unduly influence the testator. *Estate of Brehmer, supra,* 356.

### *Disposition.*

*Augusta Ritter.*

The trial court determined that as to Augusta's disposition to exert undue influence, there were several transactions in 1968 which, if unexplained, "might tend to establish that element." However, the court accepted her explanations of the transactions and we agree that the determination of the trial court is properly supported by the evidence.

The most ominous transaction involved a savings and loan account in decedent's name, containing $10,000, which, on January 22, 1968, was withdrawn by the de-

cedent and placed in a joint account with Augusta. On June 4, 1968, more than a month after Walter's death, Augusta deposited the $10,000 and interest in her sole account. Augusta testified that she used part of the money to pay the bills of the interior decorator, for carpeting and things, but that there are funds still remaining in this account.

Elizabeth Johnson, the interior decorator, testified that in February, 1968, Mr. and Mrs. Ritter were in her store and he said, "Funds have been transferred to an account for the purpose of furnishing the home." Elizabeth Johnson also testified that a building and loan was mentioned.

The appellant takes particular note of the fact that a week before the decedent executed his last will, he executed a general power of attorney on behalf of Augusta and Clarence Weinheimer giving them complete control over all decedent's property and authority to transact business for him. Augusta testified that she immediately put the document in the safe at home and never exercised any power thereunder. There is nothing in the record to indicate anything to the contrary.

The appellant questions Augusta's receipt of three blank checks signed by Walter Ritter a week before his April 11, 1968, surgery. One check was written for $25 and used to pay for a garage door repair bill. One check was never written. Three days before her husband's death, Augusta made the third check payable to herself in the amount of $2,684.09 and deposited it in her own personal checking account. Augusta testified that the money was used for household and some nursing expenses. The trial court, in accepting this explanation, noted that the $2,684.09 check was written at a time when the decedent's checking account contained $6,969.84.

A final alleged indication of Augusta's disposition to unduly influence is her refusal to allow persons to visit

her husband at the hospital. One incident involved her refusal to permit the decedent's brother, Arnold, to visit him the day before Walter's death. This incident is not considered significant because the decedent's condition had been terminal for several days and it was unlikely that Augusta could expect to procure improper favor by excluding Arnold from visiting at that late date, and there is nothing in the record to indicate that she did.

More significant is the fact that Augusta attempted to exclude Robert and his wife from visiting at the hospital. There was testimony by Augusta that her attempts to exclude Robert and his wife were due to the wishes of her husband. The court permitted this testimony for the purpose of showing the witness' state of mind, but not to show what her husband wished. This ruling contravenes the "dead man statute," sec. 885.16, Stats. The testimony amounted to examination of an interested witness with respect to a communication with a deceased person.

However, viewing all the activities of Augusta Ritter, we conclude that the trial court properly determined that Augusta was not of a disposition to exert undue influence, and the decedent was not subject to undue influence from Augusta.

*Clarence Weinheimer.*

The activities of Clarence Weinheimer are somewhat indicative of a disposition to exert undue influence. He was controller and treasurer of the funeral home, but owned no stock in the same. Weinheimer, as a cotrustee, will help guide the Ritter Funeral Home under the 1968 will, with compensation.

Appellant contends that Weinheimer was attempting to seize control of the Ritter Funeral Home. As the trial court stated, the evidence conflicts sharply as to whether Weinheimer solicited Robert and Arnold separately to join with him in an effort to dominate administration of

the funeral home after decedent's death. Weinheimer vigorously denied these alleged conversations. The trial court found that Weinheimer did make certain solicitations substantially as testified.

There is also testimony of Robert Ritter that Weinheimer told him that no visitors were allowed to see the testator at the hospital. Weinheimer denies this. The trial court gave Robert's testimony little weight as Robert was in northern Wisconsin part of the time his father was hospitalized.

Robert also accused Weinheimer of removing some documents from the funeral home safe before and after the decedent's death. Robert testified that only Weinheimer, his father and himself were permitted to go into the safe. Weinheimer denied removing any papers.

Weinheimer testified that five days before the decedent entered the hospital, he and decedent signed a notice of a special meeting of the board of directors for the purpose of removing Robert as president and Arnold Ritter as secretary. Weinheimer personally served the notice of the meeting upon Robert and Arnold. Neither was removed from his position.

Another episode is Weinheimer's alleged accusation that Robert Ritter's son filled his own automobile from the funeral home gasoline pump. Weinheimer contended that he made no accusation, but only raised the issue of whether the gasoline was pumped into the son's private car or a company car. The trial court believed Weinheimer's story. The episode is indicative of the decedent's confidence in Weinheimer.

Appellant also claims that Weinheimer's receipt of the power of attorney is evidence of wrongful disposition. However, Weinheimer's testimony that he never acted under the power is uncontradicted.

Finally, the appellant takes note of the fact that Weinheimer was a cotrustee, with Arnold Ritter and Raymond Van Roo under the funeral home pension plan.

There was a $20,000 policy upon the life of Walter Ritter held by said trustees. In January, 1968, the beneficiary was changed from Robert Ritter to the decedent's estate. However, the change of beneficiaries was approved by Walter Ritter and signed by all three trustees.

In summary, while there is some indication that Weinheimer appeared interested in the affairs and control of the funeral home, it is more conclusive of the differences between Robert Ritter and Clarence Weinheimer.

The trial court properly determined that the evidence failed to establish, by the required quantum, that Weinheimer was disposed to influence the decedent.

### Coveted Result.

The evidence falls far short of demonstrating a result clearly appearing to be the effect of undue influence.

As to Augusta Ritter, there is nothing unusual, unnatural or even very suspicious about what she receives under the 1968 will. Under the 1968 will Augusta is given only what the decedent contracted to give her under the antenuptial agreement, plus the right to live in the home owned by Walter Ritter, which the two of them had spent considerable time and money refurbishing. Augusta was permitted to live in the residence for her life or until she remarried or voluntarily vacated. Moreover, the antenuptial agreement provided that neither Walter nor Augusta was barred from giving or willing other property if desired.

Clarence Weinheimer took nothing under the will, but the appellant infers that he exerted undue influence for the purpose of collecting fees as coexecutor and cotrustee. As coexecutor Weinheimer would receive compensation for a couple of years and as cotrustee he would receive compensation for the life of Robert Ritter and until Robert's children reach age forty (the youngest of which

is thirteen years old). The appellant also points out that as cotrustee Weinheimer has considerable control over 4,000 shares of the funeral home stock held in the deceased's estate.

However, little had changed in this respect as far as Weinheimer was concerned that did not exist in years past. As pointed out before, Weinheimer had been a confidant to the decedent in business matters for many years. Weinheimer was a coexecutor and cotrustee under the will of the decedent's first wife; a trustee under the Walter Ritter insurance trust since December 1, 1955; executor under the wills of Walter Ritter dated January 12, 1962, and September 8, 1964; an executor under the 1967 will; a trustee of the $25,000 trust left to Augusta under the 1967 will; and an attorney-in-fact under the decedent's powers of attorney executed on June 12, 1964 and February 28, 1968.

It is also significant that the residue of the estate under the 1968 will deviates from the 1967 will only in that it does not leave the residue of the property to Robert Ritter outright but places it in trust for the benefit of Robert and his family with the remainder to the grandchildren of Walter Ritter. The 1968 will also follows a format similar to the trust set up under the will of the decedent's first wife and the 1955 insurance trust of Walter Ritter. The record also reflects that the decedent's business had been financially successful and that he was interested in his son, who was associated with him in business. This has resulted in Robert acquiring substantial financial independence.

The appellant has not demonstrated undue influence by clear, satisfactory and convincing evidence, and the trial court's findings are not against the great weight and clear preponderance of the evidence.

*By the Court.*—Judgment affirmed.