ESTATE OF VELK: VELK and others, Appellants, v. LEWANDOWSKI and another, Respondents.

*No. 181. Argued December 2, 1971.—Decided January 4, 1972.*
(Also reported in 192 N. W. 2d 844.)

For the appellants there were briefs by *Ben Lewis* of Milwaukee, for Leonard Velk and Harry Velk, and by *Walther, Halling & Conmey* of Milwaukee, for John Rozanski, Margaret Rozanski, Barbara Wahlen, James Rozanski, and Elizabeth Rozanski, attorneys, and *David L. Walther* and *F. M. Van Hecke,* both of Milwaukee, of counsel, and oral argument by *Mr. Lewis* and *Mr. David L. Walther.*

For the respondents there was a brief and oral argument by *Mark M. Camp* of Wauwatosa.

BEILFUSS, J. The issue is whether the two conclusive findings of the trial court, namely, that the testator did not lack testamentary capacity and that the will was not the result of undue influence are against the great weight and clear preponderance of the evidence. The objectors claim that a presumption that the testator lacked testamentary capacity arises from the facts and that this presumption has not been rebutted or overcome; they also claim a fiduciary relationship existed between the testator and Martha Lewandowski which gave rise to an inference of undue influence.

The objectors contend that Joe Velk lacked testamentary capacity on March 6, 1970, because he was suffering from arteriosclerotic cerebral vascular disease. Objectors base this contention on the testimony of Dr. Deardorff, who first diagnosed Joe Velk's condition in August of 1964, when Joe Velk was suffering from intermittent confusion, loss of memory and persistent headaches. He examined Joe Velk again in October and December of 1964, but did not see him thereafter. Dr. Deardorff testified that Joe Velk's condition could deteriorate over the next few years and that deterioration was probable but not certain.

However, this court has ruled that the test is whether the testator has testamentary capacity at the time of making his will, even in situations where the testator has suffered periods of incapacity and is suffering from common infirmities of old age, including arteriosclerosis. *Estate of Phillips* (1961), 15 Wis. 2d 226, 112 N. W. 2d 591.

The proponents of the will introduced other testimony that demonstrated that Joe Velk possessed testamentary capacity at the time of executing his will. This evidence

supports the trial court's finding of testamentary capacity and overcame a presumption to the contrary if the evidence was sufficient to raise such presumption.

Dr. Piero Gasparri, who had examined testator in September, 1964, and also in 1967, examined testator on January 15 and February 25, 1970. Aside from Joe Velk's medical problems, Dr. Gasparri found that Joe Velk was well oriented, alert and in full possession of his faculties.

Dr. Chris Christopher examined Joe Velk at home on March 15 and March 24, 1970. He also saw him daily from March 29 through April 3, 1970, the day before testator's death. Dr. Christopher found Joe Velk to be well oriented, alert and free from mental difficulties.

On March 6, 1970, when testator's will was executed, Attorney Kenneth Berger, who drafted Joe Velk's will, believed Joe Velk had testamentary capacity. Berger testified:

"I am aware of the fact that it is possible for a person to have a lucid interval and be not competent at other times but, in my conversation with Joe Velk on that day, he knew where his property was, he knew who his children were, he knew almost to the penny the amount of the mortgage that remained on the Pulaski Street property, and we discussed between ourselves the wisdom of whether or not he should dispose of this, discharge that mortgage and clear up that debt because I pointed out to him that what he was paying in the way of interest and what he was earning in the way of interest was substantially the same, and he probably would be better off if he had it free of debt. And one of the reasons why this will contains the language that it does is because he said we should think about that; we better put that in the will."

Objectors advance many facts that in themselves might support an inference that Joe Velk lacked testamentary capacity at some prior time, but none of those facts related to the period of time directly before, during or

after the time that Joe Velk executed his will. The testimony of Dr. Gasparri, Dr. Christopher, and that of Attorney Berger readily supports the finding that Joe Velk had testamentary capacity on March 6, 1970. It is necessary only that the testator have capacity at that time. *Estate of Phillips, supra; Estate of O'Loughlin* (1971), 50 Wis. 2d 143, 183 N. W. 2d 133; *Estate of Fuller* (1957), 275 Wis. 1, 81 N. W. 2d 64.

Attorney Berger, as cited above from the record, concluded that Joe Velk understood the nature, the extent, and the state of affairs of his property. They talked for over an hour about the will. These facts fulfill the basic elements of the testamentary capacity test. *Estate of O'Loughlin, supra,* at page 146; *Will of Wicker* (1961), 15 Wis. 2d 86, 112 N. W. 2d 137.

The trial court's finding that Joe Velk had testamentary capacity on March 6, 1970, is not against the great weight and clear preponderance of the evidence and must be affirmed. In fact, the evidence advanced by the proponents of the will positively demonstrates that Joe Velk had testamentary capacity on March 6, 1970. The presumption of testamentary incapacity was never raised and therefore the proponents of the will did not have to rebut any such presumption.

The trial court found that Joe Velk was not susceptible to undue influence. The court also found that neither Martha nor Gerry Lewandowski were disposed to exercise undue influence over Joe Velk, and that no coveted result, "whatever that may have been, obviously was not obtained."

The finding by the trial court that no undue influence was exercised in the execution of a will, will be sustained by this court unless the finding is against the great weight and clear preponderance of the evidence. *Will of Cooper* (1965), 28 Wis. 2d 391, 137 N. W. 2d 93; *Estate of Steffke* (1970), 48 Wis. 2d 45, 179 N. W. 2d

846. It is the nature of undue influence that the proof of it rests primarily upon circumstantial evidence. *Will of Cooper, supra,* at page 394; *Will of Freitag* (1960), 9 Wis. 2d 315, 101 N. W. 2d 108.

The appellants argue that Martha Lewandowski was in a fiduciary relationship with Joe Velk and, as such, a presumption of undue influence arose, and that this presumption, coupled with the other circumstances, creates an inference of undue influence. *Estate of Komarr* (1970), 46 Wis. 2d 230, 175 N. W. 2d 473. Therefore, appellants argue, the proponents of the will had the duty of rebutting the presumption. Further, the proponents failed to meet that duty. Respondents-proponents, of course, deny that Martha Lewandowski was in a fiduciary relationship with Joe Velk.

In *Estate of Steffke, supra,* at page 51, this court stated:

"But it is also claimed Mrs. Lane stood in a confidential relationship to Steffke and such relationship, plus being a beneficiary, raise a presumption of undue influence. This contention is a misreading of the *Will of Cooper, supra,* and the *Will of Faulks, supra.* The basis for the undue influence presumption lies in the ease in which a confidant can dictate the contents and control or influence the drafting of such a will either as the draftsman or in procuring the drafting. . . . If one is not the actual draftsman or the procurer of the drafting, the relationship must be such that the testator depends upon the advice of the confidant in relation to the subject matter of the will. . . ."

In the instant case, Martha Lewandowski testified that she contacted Attorney Berger about the matter of the $1,500 debt owed to Joe Velk by her son Gerry. This testimony is corroborated by the testimony of Attorney Berger. Berger further stated that in the course of his conversation with Joe Velk on the morning of March 6, 1970, he was the person who first brought

up the subject of making a will to forgive Gerry Lewandowski's debt. Berger stated that he and Joe Velk then further discussed the testamentary disposition of Joe Velk's property. Berger requested that Martha and Gerry Lewandowski leave the room before he and Joe Velk discussed the will.

In view of the evidence and the test for the raising of a presumption of undue influence, as given in *Estate of Steffke, supra,* and *Estate of Komarr, supra,* the presumption of undue influence does not arise in this case unless the testator has relied on the advice of the confidant in relation to the subject of the will. However, Berger and Velk specifically excluded Martha and Gerry Lewandowski from the hour-long conversation in which the will was being discussed for the first time. Martha Lewandowski testified, and the trial court found, that she did not read the will until March 30, 1970, the day after Joe Velk was hospitalized. Upon these facts no presumption of undue influence arises in this case, and certainly no inference of undue influence was established as a matter of law.

Appellants must show, therefore, that the trial court's determination that no undue influence was exerted by Martha and Gerry Lewandowski was against the great weight and clear preponderance of the evidence.

An objector must establish four elements in order to void a will for undue influence. *Estate of McGonigal* (1970), 46 Wis. 2d 205, 208, 209, 174 N. W. 2d 256; *Estate of Brehmer* (1969), 41 Wis. 2d 349, 351, 164 N. W. 2d 318. The four elements are:

" '*Susceptibility*—a person who is susceptible of being unduly influenced by the person charged with exercising undue influence.

" '*Opportunity*—the opportunity of the person charged to exercise such influence on the susceptible person to procure the improper favor.

" '*Disposition*—a disposition on the part of the party charged to influence unduly such susceptible person for

the purpose of procuring an improper favor either for himself or another.

"*'Coveted Result*—a result caused by, or the effect of, such undue influence. . . .'"  46 Wis. at pages 208, 209.

The court in *Brehmer, supra,* also stated that when three of the four elements have been established by the required proof, only slight evidence as to the fourth element is necessary to move its existence. *Estate of Brehmer, supra,* at page 352; *Will of Freitag, supra,* at page 318.

A. *Susceptibility.*

The record shows that Joe Velk was a strong-willed man who was "very tight with the buck." He executed his own financial affairs from the day he was in full possession of his mental faculties until the time of his death. The record shows that in October, 1967, he met a childhood friend, Catherine Zasada, whom he asked to become his housekeeper because Martha was not home enough to suit him. This meeting indicates that Joe Velk was not overly susceptible to Martha's influence.

Martha also testified that she did everything that Joe Velk told her to do. He prepared a list of tasks every morning which Martha was to perform. He did his own banking, handled the cash, and generally carried out his own financial transactions. She did the housework, obtained tradesmen, cleaned vacated apartments. No evidence contradicted this testimony. The trial court could very well believe that Joe Velk was never susceptible to undue influence, as the record amply discloses that Joe Velk was an independent and self-willed man. The trial court's finding of nonsusceptibility is not against the great weight and clear preponderance of the evidence.

B. *Opportunity.*

Since Martha Lewandowski lived alone with Joe Velk for well over four years there is no doubt that had Joe Velk been susceptible to undue influence she had the

opportunity to influence him even though she was not present when Joe Velk executed his will. *Estate of McGonigal, supra,* at page 214.

C. *Disposition.*

The trial court found that neither Martha nor Gerry Lewandowski had the disposition to unduly influence Joe Velk. This court, in *Estate of McGonigal, supra,* at page 214, defined such a disposition in the following way:

". . . Disposition to unduly influence means more than a desire to obtain a share of an estate. '. . . It implies a willingness to do something wrong or unfair, and grasping or overreaching characteristics.' "

The record shows that neither Martha nor Gerry Lewandowski thought of bringing Berger to Joe Velk's home for the purpose of drafting a new will. All three persons testified that the sole reason for Berger's visit to Joe Velk was to discuss the $1,500 owed by Gerry Lewandowski to Joe Velk. Berger initiated the discussion about the drafting and execution of a will. Prior to this meeting Berger had been doing at least some legal work for Joe Velk for approximately two years. Martha Lewandowski did not play any role in the drafting or the execution of the will. Gerry Lewandowski testified that Berger "was like a clam" about his and Joe Velk's discussion on the morning of March 6, 1970. There is no evidence to show that Martha Lewandowski discussed the making of a will before Berger and Joe Velk discussed its terms. The trial court found that Martha Lewandowski learned of the will only after its execution and she did not learn of its provisions until Easter Monday, 1970. *Estate of McGonigal, supra; Will of Grosse* (1932), 208 Wis. 473, 243 N. W. 465. When asked about what she thought of her bequest she bluntly replied that she thought she deserved more. The trial court also found that Gerry Lewandowski's testimony

indicated that he was unlikely to influence anyone, especially Joe Velk, who was a strong-minded, independent person.

The appellants-objectors assert that Martha Lewandowski raised the rents on Joe Velk's rental property. There is no evidence to show that she, on her own accord, raised the rents. In fact, such an allegation is inconsistent with Joe Velk's tight-fisted control over his financial matters. Since Joe Velk received the rent increases it is difficult to ascertain precisely what benefit Martha Lewandowski obtained from the rent increases.

The evidence shows that Joe Velk was much more likely to control and dispose Martha Lewandowski than she was able to control or dispose him. She worked for Joe Velk for more than four years without receiving any pay. She might have wished to influence him but quite clearly she was unable to do so. The trial court's finding is not against the great weight and clear preponderance of the evidence.

D. *Coveted Result.*

The appellants-objectors contend the will is unnatural in four ways: (1) The forgiveness of Gerry Lewandowski's $1,500; (2) the $500 bequest to St. Barbara's Church; (3) the exclusion of Clara's children from the will; and (4) the bequest of the use of the South 33rd Street residence to Martha Lewandowski for her lifetime, coupled with the bequest of the net income from the rental property on Pulaski Street for the rest of her life.

If a will is unnatural a suspicion is raised that undue influence existed and operated in the drafting and execution of the will. *Will of Behm* (1925), 187 Wis. 10, 203 N. W. 718. However, whether a will is unnatural depends upon the circumstances of each case. *Will of Dobson* (1951), 258 Wis. 587, 46 N. W. 2d 758.

The appellants argue that as to the question of whether the will was unnatural, the terms of a prior will are relevant. *Will of Stanley* (1937), 226 Wis. 354, 276 N. W. 353. In 1955 (some fifteen years before), an Attorney Erasmus drafted a will for Joe Velk which distributed his estate equally to Joe Velk's three children. Under the terms of this will, if one of the three children had predeceased him the child's share would have been distributed to the child's issue. Attorney Erasmus did not know whether Joe Velk ever executed the will nor was there other proof that he did.

The 1970 will in question omitted Clara's children altogether. Appellants argue that this is unnatural because Joe Velk loved Clara's five children, especially Margaret. Yet this fact does not directly bear upon what Martha Lewandowski coveted and received. Clara's children are all adults and married or otherwise self-supporting. Further, the trial court specifically acknowledged that under sec. 238.11, Stats., these grandchildren may have enforceable rights to a share of the estate if this omission was not intentional.

Martha received the residence for use in her lifetime and the net income from a gross income of $7,600 per year. Her son received a forgiveness of a $1,500 debt on a note on which he had paid nothing for at least seven years and which might not have been legally collectible. Neither of these bequests is so munificent that they can be labeled as unnatural and as a coveted result. The bequest to Martha makes it appear that Joe Velk was attempting to provide for her welfare for the rest of her life in return for her uncompensated care of him for several years. The record does not disclose what the net income would be, but after taxes, repairs and other costs the net income gives Martha Lewandowski a moderate income for the rest of her life. (Her life expectancy was calculated at 8.97 years.) The

properties revert upon her death to the estate, and Joe Velk's children will then receive the rest of the estate.

Joe Velk left an estate worth over $100,000. He left $500 for masses to be said for the repose of his soul. As respondents argue, a man advanced in years might very well forego his quarrel with the church and hasten to prepare himself for a Maker heretofore neglected. At any rate, $500 is not an excessive amount when the total value of the estate is considered.

The trial court's finding that no coveted result was attained is not against the great weight and clear preponderance of the evidence.

The findings that the testator had testamentary capacity at the time the will was drawn and that the evidence does not establish that the will was a product of undue influence are not against the great weight and clear preponderance of the evidence. The order admitting the will to probate should be affirmed.

*By the Court.*—Order affirmed.