ESTATE OF VON RUDEN : FISCHBACH and others, Appellants, v. KNUTSON, Executor, Respondent.

*No. 28. Argued June 5, 1972.—Decided June 30, 1972.*
(Also reported in 198 N. W. 2d 583.)

366

For the appellants there was a brief by *Johns, Flaherty, Harman & Gillette* and *Daniel T. Flaherty,* all of La Crosse, and oral argument by *Daniel T. Flaherty.*

For the respondent there was a brief by *Hale, Skemp, Hanson, Schnurrer & Skemp* of La Crosse, and oral argument by *William P. Skemp.*

CONNOR T. HANSEN, J. We have examined and considered the extensive record and agree with the trial court that the proof was not sufficient to support either a finding of incompetence or undue influence. Therefore, we will not extensively discuss the evidence.

The testator suffered from cerebral arteriosclerosis and arteriosclerotic heart disease which began in 1960 and was evidenced by syncope, or fainting spells. As a result of this condition, he was hospitalized for substantial periods of time in 1962 and 1966. In 1967, he was transferred to the Vernon county home for the retired because he was no longer able to care for himself. This transfer occurred during the same year his brother, Valdemar, died. Adelbert died in 1960. Testator had served as executor of Valdemar's estate and it appears he relied a great deal upon Sagmoen to carry out his duties as executor. It was shortly after his appointment as executor of Valdemar's estate that Sagmoen was given power of attorney for the testator.

Sagmoen was fifty-some years of age and also unmarried.

In 1963, Sagmoen and his partner, Paul Stenslein, rented five acres of tobacco land from Valdemar and the testator. After the testator entered the Vernon county home, they rented the entire 143-acre farm. For many years Sagmoen had frequently visited the testator, had been very friendly to him, and had been of general assistance to him. None of the nieces or nephews lived in the vicinity of the Vernon county farm. Testator had an affection for his elderly sister, who lived in South Dakota. The nieces and nephews sent him Christmas cards, and the like; however, the record does not disclose that the testator ever responded. It appears that some of the nieces and nephews were of the opinion the testator had been incompetent for many years.

Attorney Olga Bennett (now Judge) represented the testator when he served as executor of the estate of Valdemar. Testator's prior will designated Valdemar as the beneficiary. On two or three occasions in 1968 or 1969, at the request of the testator, Sagmoen testified he contacted Bennett in regard to going to the county home to redraft his will. Bennett testified she went to see the testator but did not discuss the redrafting of his will with him because from her observation she believed him to be then incompetent. She also, at one time, and for the same reason, declined to approach him about conveying a portion of the farm to the county.

July 4, 1969, on behalf of the testator, Sagmoen called attorney Lester D. Skundberg of Westby and asked him if he could come to county home and draft a will. Sagmoen informed Skundberg he had contacted Bennett on two occasions but that she had done nothing and kept putting it off. Skundberg did not know the testator, had never done any legal work for the Von Ruden family, but did know of the general location of the

farm and had known testator's father. Skundberg went to the county home, interviewed the testator, and then returned to his office to get the necessary papers and procure a witness. The witness Skundberg procured was Lincoln Knutson, president of the bank, who had known testator for approximately fifteen years. At the county home, Skundberg and Knutson, without Sagmoen being present, had a conversation with the testator which included a general inquiry into the nature and extent of his property. It was determined that the testator owned the farm and a house in Westby and an undetermined amount of personal property.[1] Skundberg and Knutson then left the room and discussed testator's mental capacity. Both were firmly of the opinion that he was competent. Skundberg then returned to the room and inquired of the testator about his relatives. Von Ruden stated he wanted to leave everything to Sagmoen because he had been good to him, taken care of the work out at the farm and was the only one who had done anything for him. He also stated that his sister was old and had enough to take care of herself, which fact appeared to be correct. He was emphatic in stating he did not want anything to do with his nieces or nephews and that they were not going to get anything. He also stated he did not want Sagmoen to get anything until he was gone. Skundberg then drafted the will and had Knutson return to the room. The matter was again discussed with the testator and he repeated essentially what he had previously told Skundberg, with the same emphasis in regard to his nieces and nephews. The testator then executed the will by making an "X," unaided, and it was duly witnessed by Skundberg and Knutson.

At no time were the contents of the will discussed with Sagmoen, and the first time he learned he was bene-

---

[1] At oral argument it was stated the total assets of the estate were between $30,000 and $35,000.

ficiary was after testator's death, at which time he appeared noticeably surprised.

Both Skundberg and Knutson testified that the testator was competent at the time the will was executed and that he was under no undue influence. Dr. Bland was testator's treating physician and had known him for eighteen years. He testified that in his opinion, prior to July 4, 1969, Von Ruden was at times mentally competent. He had not been called to see the testator from June 12, 1969, to July 23, 1969; however, he hypothesized that on July 4, 1969, the testator was normal and rational and hence competent and stated the reasons for reaching such an opinion.

In all, some 35 witnesses were called by the respective parties. As might be expected, their testimony was in conflict. However, there is no testimony in the record as to his mental capacity on July 4, 1969, except the two witnesses to the will and the response of Dr. Bland to the hypothetical question. Among the witnesses called were several nurses at the county home. Their testimony is also conflicting as to the testator's competency.

*Testamentary capacity.*

The test for determining testamentary capacity was recently stated by this court in *Estate of O'Loughlin* (1971), 50 Wis. 2d 143, 146, 147, 183 N. W. 2d 133:

"The testator must have mental capacity to comprehend the nature, the extent, and the state of affairs of his property. The central idea is that the testator must have a general, meaningful understanding of the nature, state, and the scope of his property but does not need to have in his mind a detailed itemization of every asset; nor does he need to know the exact value of his property. A perfect memory is not an element of a testamentary capacity. 1 Page, *Wills* (Bowe-Parker), p. 617, sec. 12.12. The testator must know and understand his relationship to persons who are or who might

naturally or reasonably be expected to become the objects of his bounty from which he must be able to make a rational selection of his beneficiaries. He must understand the scope and general effect of the provisions of his will in relation to his legatees and devisees. Finally, the testator must be able to contemplate these elements together for a sufficient length of time, without prompting, to form a rational judgment in relation to them, the result of which is expressed in the will."

The test is whether the testator possesses sufficient capacity *at the time the will is executed. Estate of Velk* (1972), 53 Wis. 2d 500, 192 N. W. 2d 844; *Estate of Fuller* (1957), 275 Wis. 1, 81 N. W. 2d 64.

". . . [A] person may be incompetent to make a will at one period of time and yet be competent during a lucid interval between periods of sickness. *Will of Silverthorn* (1887), 68 Wis. 372, 378, 32 N. W. 287. In a somewhat similar case, this court found a testator suffering from advanced arteriosclerosis competent to make a will on the date of its execution. *Estate of Phillips* (1961), 15 Wis. 2d 226, 112 N. W. 2d 591. . . ." *Estate of O'Loughlin, supra,* page 147.

In the instant case, the trial court relying on the testimony of Skundberg, Knutson and Dr. Bland found that the testator did possess sufficient capacity, in accordance with the applicable test, to execute a will on the date in question. These findings are not against the great weight and clear preponderance of the evidence.

Appellants argue that the testator did not know how much money he had. Furthermore, he was not asked nor did he reveal the nature and extent of his personal property, or the total value of all his assets. However, a testator is not required to know the exact value of his property, or to detail and itemize his assets. *Estate of O'Loughlin, supra,* pages 146, 148; *Will of Ganchoff* (1961), 12 Wis. 2d 503, 107 N. W. 2d 474. In the instant case the testator had sufficient comprehension of his property at the time he made his will.

*Undue influence.*

In order to void a will because of undue influence, four elements must be proved by clear, satisfactory and convincing evidence:

"*Susceptibility*—a person who is susceptible of being unduly influenced by the person charged with exercising undue influence.

"*Opportunity*—the opportunity of the person charged to exercise such influence on the susceptible person to procure the improper favor.

"*Disposition*—a disposition on the part of the party charged to influence unduly such susceptible person for the purpose of procuring an improper favor either for himself or another.

"*Coveted Result*—a result caused by, or the effect of, such undue influence. *Will of Freitag* (1960), 9 Wis. 2d 315, 317, 101 N. W. 2d 108.

". . .

"The burden is upon the objector to prove by clear, satisfactory and convincing evidence that the will was a result of undue influence. However, in recognition of the difficulty of proving undue influence an additional rule is applicable. When three of the four elements are established by the required proof, only slight evidence as to the fourth element is necessary to prove its existence. *Will of Freitag, supra,* page 318." *Estate of Brehmer* (1969), 41 Wis. 2d 349, 351, 352, 164 N. W. 2d 318.

*See also: Estate of Velk, supra,* pages 508, 509; *Estate of McGonigal* (1970), 46 Wis. 2d 205, 174 N. W. 2d 256; *Estate of Ritter* (1969), 43 Wis. 2d 507, 168 N. W. 2d 588. In addition, undue influence may be proved independently of the above criteria where a confidential or fiduciary relationship exists between the testator and the beneficiary coupled with the existence of "suspicious circumstances." *Estate of Komarr* (1970), 46 Wis. 2d 230, 175 N. W. 2d 473; *Will of Cooper* (1965), 28 Wis. 2d 391, 137 N. W. 2d 93. Appellant posits both

theories in support of the contention that the will in the instant case was the result of undue influence.

The trial court did not make a specific finding as to susceptibility. However, in view of the fact that there is little evidence to show that the testator was strong-willed or was a sophisticated businessman and the fact that he placed a great deal of trust in Sagmoen, to whom he had executed a power of attorney, the evidence could support a finding of susceptibility. *Estate of McGonigal, supra,* page 213. Also, there is no doubt that Sagmoen had the opportunity to exercise influence over the testator and the trial court so found.

In considering the element of disposition, we are of the opinion that the evidence, viewed in its entirety, is not clear and convincing that Sagmoen was disposed to influence the testator. *Estate of Ritter, supra,* pages 514–516; *Estate of McGonigal, supra,* pages 214–216. We do not agree with appellants' contention that the drafting of the will was a hasty process. On behalf of the testator, Sagmoen had several contacts with Attorney Bennett prior to contacting Attorney Skundberg. There was a considerable lapse of time between the time Sagmoen first contacted Bennett and the actual drafting of the will. Also, under the circumstances of this case the will was not hastily executed. Furthermore, at no time did Sagmoen discuss the provisions of the will with the testator or did he have knowledge of its contents until after testator died.

Appellants allege the following facts with respect to the testator's property as a basis for finding the element of disposition by Sagmoen: Sagmoen's business partner moved into the testator's house without paying rent; Sagmoen used the farmyard for storing trucks in connection with his business, without the payment of any rent; Sagmoen planted grain with which to feed his cattle on part of the land which had previously been in the soil bank and used the testator's hay to feed his

cattle, all without payment to the testator; and, all of the repairs on the farm equipment and the farmhouse were paid by Sagmoen out of the testator's checking account. In addition, three expenses were paid out of the testator's account which were not paid by check. Two of these disbursements were for equipment and were made in June of 1969 to Sagmoen's service station and totaled $19.50. The other was a payment to Stenslein's father in December of 1969 for corn picking. Finally, there was a cash disbursement of $1,500 made July 14, 1969, payable to Sagmoen and Stenslein.

All of the above circumstances, if unexplained, might tend to establish a disposition on the part of Sagmoen. Although the trial court made no specific finding in this regard, sufficient explanation is found in the testimony of Sagmoen and Stenslein with respect to each of these circumstances. It appears that Stenslein moved into the testator's farmhouse at the request of the testator and to take care of the house. These arrangements were made prior to Valdemar's death. The land which was taken out of the soil bank consisted of nine acres and Sagmoen testified that the testator wanted the farm worked again. Testator did not want any money for the hay which was used to feed Sagmoen's cattle and was satisfied just to have the manure put back on the land again. Testator continued to receive payments for the tobacco crop and it appears that by the terms of the agreement made in 1963, the testator, and his brother, were to supply all the equipment and fertilizer while Sagmoen and Stenslein were to perform all the labor. Therefore, the disbursements made in connection with the repair of the farmhouse and farm machinery would appear proper.

A consideration of the element of a coveted result goes to the naturalness or expectedness of the bequest. Whether a will is unnatural, however, must be determined from a consideration of all the surrounding cir-

cumstances. *Estate of Velk, supra,* page 511; *Estate of McGonigal, supra,* page 217. The mere fact that a testator has chosen to leave his property to close friends rather than to relatives does not necessarily render the disposition unnatural. *Estate of Steffke* (1970), 48 Wis. 2d 45, 49, 179 N. W. 2d 846.

In the instant case the trial court found, ". . . [t]hat the will under all the circumstances with the aid and help rendered by Kermit Sagmoen is a natural will." The court based its conclusion on the relationship between Sagmoen and the testator and the fact that the testator had explained why he was excluding his sister and nieces and nephews at the time of execution. Also relevant is the fact that none of the objectors were ever included in any previous will. *See: Estate of Velk, supra,* page 512. Under the circumstances of this case, it was entirely natural for the testator to leave all of his property to Sagmoen. *Estate of O'Loughlin, supra,* pages 149, 150; *Will of Faulks* (1945), 246 Wis. 319, 364, 365, 17 N. W. 2d 423.

We are of the opinion that the appellants have failed to sustain their burden of proof by clear and convincing evidence and the determination of the trial court that the will was not a result of any undue influence is therefore affirmed.

We are also urged to invoke the inference of undue influence because Sagmoen stood in a fiduciary relationship with the testator by virtue of the power of attorney and because there existed "suspicious circumstances" surrounding the execution of the will.

When considering this issue the trial court stated:

". . . The attorneys for the Objectors have repeatedly advised the Court that they relied on the case of the *Estate of Komarr* 46 Wis. 2d 230. The Court finds that the facts presented in this case are not comparable in any manner with the facts as set forth in the *Estate of Komarr.*"

In *Estate of Komarr*, this court stated on pages 239, 240:

". . . [T]he existence of a confidential relationship between the testatrix and the favored beneficiary does not of itself constitute undue influence but when coupled with suspicious circumstances may give rise to an inference thereof. In *Faulks* this court indicated such circumstances, although not exhaustive, included activity of the beneficiary in procuring the drafting and execution of the will, as well as any sudden and unexplained change in the attitude of the testator."

In the instant case, there is no question that the beneficiary under the will stood in a fiduciary relationship with the testator. While Sagmoen was active in procuring the drafting of the will, under the circumstances, neither the actual drafting nor the procurement thereof was done with any great haste. The actual will, while not to be recommended as a model in draftsmanship, is not such as to rise to the level of a suspicious circumstance when considering the place and manner in which it was drafted. There was no sudden change in the testator's physical condition prior to the execution of the will. The evidence does not clearly establish that the testator had a particularly close relationship with his nieces and nephews which suddenly changed just prior to the execution of the will. Under the facts of this case it cannot be said that an inference of undue influence arose as a matter of law. The trial court's determination that "the results of the Will clearly are not the results of any influence" is not against the great weight and clear preponderance of the evidence.

*By the Court.*—Order affirmed.