WARD (Ethel), Plaintiff and Respondent, v. WARD (Ronald), Defendant and Respondent: WARD (Sadie), Appellant.

*No. 290. Argued February 5, 1974.—Decided March 5, 1974.*
(Also reported in 215 N. W. 2d 3.)

For the appellant there were briefs by *Barsness Law Offices*, and *John G. Barsness*, all of Madison, attorneys, and *David Post Smith* of Boscobel, of counsel, and oral argument by *John G. Barsness*.

For the plaintiff-respondent there was a brief by *Johns, Flaherty, Harman & Gillette, S. C.*, and *Daniel T. Flaherty*, all of La Crosse, attorneys, and *J. L. Rath* of Gays Mills, of counsel, and oral argument by *Daniel T. Flaherty*.

CONNOR T. HANSEN, J. Ronald and Ethel Ward were married in 1946. They lived on the subject farm from the time of their marriage and worked it on shares until it was conveyed to them. Sadie Ward and her husband did not live on the farm, and in 1958, he died. In 1959, Sadie conveyed the farm to Ronald and Ethel on a land contract. The contract provided for a purchase price of $10,000, with $500 to be paid at the execution thereof, and the balance at a rate of not less than $1,000 per year.

Payments were to be made by the assignment of one third of the proceeds received from the farm's milk production on a semimonthly basis. The contract provided that no interest would accrue on the outstanding balance.

Payments totaling $3,685.27 were made on the land contract through September, 1961. At that time Sadie agreed to suspend payments because the farm needed repairs, including a new roof for the barn. Other than a payment of $67.89, which was credited on the contract because of a half pig that Sadie was given and some repairs that Ronald performed on her property, no further payment was made on the land contract. There is evidence that Sadie's lawyer, Elmer Queram, asked Ronald to resume these payments if he could.

Ronald and Ethel did not have a happy marriage. On April 15, 1970, Ethel commenced an action for separate maintenance. Queram, the family court commissioner, issued a temporary order on April 21, 1970, giving Ethel the use of the house and providing that Ronald could continue to work the farm. Ronald had separate employment in town during the day and after this order was entered he moved into his mother's home in Steuben. On July 7th, Ethel Ward served her complaint against Ronald.

Ronald subsequently asked Queram what was necessary to sign the farm back to his mother, Sadie Ward. Queram explained what papers would have to be prepared and told Ronald that Ethel would also have to sign them. Ronald told Queram to draw them up. Either on or shortly before July 20, 1970, Ronald and Ethel reached some sort of reconciliation, and on that date Ethel and Ronald signed a quitclaim deed to the farm transferring it back to Sadie Ward. The quitclaim was given for $1 and other good and valuable consideration. It was agreed that Ronald and Ethel could remain on

the farm with their family until the end of the year. Shortly after the quitclaim deed was executed, Ronald moved back into the house. On July 24, 1970, four days after the quitclaim deed had been signed, the couple had trouble again. Ethel testified at trial that Ronald came home drunk and threatened to kill her. Ethel and some of her children fled from the house across a field and to a neighbor's house. Trouble continued between the couple until Ethel, upon the advice of Queram, moved out of the house on August 28, 1970. On October 2d, Ethel again commenced an action for separate maintenance.

In February, 1971, this action was commenced by Ethel in an attempt to restrain the sale of the farm and to set aside the quitclaim deed. A hearing was held on the motion for temporary injunction on February 17th, at which time it was established that Sadie Ward had already sold the farm to John Trumm on February 4, 1971, for $32,000. Trumm sold the farm on July 1st, for $54,000. The trial court concluded that Sadie had sold the farm without a real estate agent and that no real investigation was made by her at that time of the real estate market or values in the area. However, Trumm was a purchaser for value and without notice; therefore, the sale to him could not be set aside.

The court ordered Sadie Ward to deposit the proceeds of the sale in insured accounts pending the outcome of the action. At the conclusion of trial, the court found that Ronald Ward had made untrue, false and fraudulent representations to Ethel Ward that Sadie Ward was threatening immediate foreclosure on the land contract and that Ethel and Ronald had no choice but to quitclaim the property back to Sadie; that Ronald falsely and fraudulently promised to reconcile and mend his ways by stopping his physical abuse of her if she would join in the conveyance; that Ethel was in fear of her safety and subject to Ronald's undue influence at the time she executed the quitclaim deed; that Ronald misrepresented

the value of their equity in the farm at the time the deed was executed; and that it was without adequate consideration.

The trial court concluded, on the basis of its findings, that Ronald and Ethel were entitled to recover from Sadie the excess of the proceeds of the sale of the farm to Trumm ($32,000), less the amount due on the land contract ($5,746.84), or $26,253.16, together with the interest earned on said amount from the time it had been on deposit. Ethel Ward was also allowed her costs and disbursements. Moreover, the court ordered that the amount awarded Ronald and Ethel remain on deposit pending the outcome of the separate maintenance action.

The appellant contends that the trial court's findings are contrary to the great weight and clear preponderance of the evidence; that the record does not support the conclusion that Ethel was under the undue influence of Ronald; and that the conveyance is not voidable on the grounds of inadequate consideration.

*Issue.*

We are of the opinion the following issue is dispositive of this appeal: Whether there was sufficient evidence upon which the trial court could have concluded that Ethel Ward was subject to the undue influence of Ronald Ward at the time she signed the quitclaim deed, and the deed could, therefore, be declared voidable?

*Estate of Von Ruden* (1972), 55 Wis. 2d 365, 373, 198 N. W. 2d 583, sets forth a recent summary of the necessary elements for a finding of undue influence:

"In order to void a will because of undue influence, four elements must be proved by clear, satisfactory and convincing evidence:

" '*Susceptibility*—a person who is susceptible of being unduly influenced by the person charged with exercising undue influence.

" '*Opportunity*—the opportunity of the person charged to exercise such influence on the susceptible person to procure the improper favor.

" '*Disposition*—a disposition on the part of the party charged to influence unduly such susceptible person for the purpose of procuring an improper favor either for himself or another.

" '*Coveted Result*—a result caused by, or the effect of, such undue influence. *Will of Freitag* (1960), 9 Wis. 2d 315, 317, 101 N. W. 2d 108.

" ' . . .

" 'The burden is upon the objector to prove by clear, satisfactory and convincing evidence that the will was a result of undue influence. However, in recognition of the difficulty of proving undue influence an additional rule is applicable. When three of the four elements are established by the required proof, only slight evidence as to the fourth element is necessary to prove its existence. *Will of Freitag, supra*, page 318.' *Estate of Brehmer* (1969), 41 Wis. 2d 349, 351, 352, 164 N. W. 2d 318.

*See also: Estate of Velk, supra*, pages 508, 509; *Estate of McGonigal* (1970), 46 Wis. 2d 205, 174 N. W. 2d 256; *Estate of Ritter* (1969), 43 Wis. 2d 507, 168 N. W. 2d 588. In addition, undue influence may be proved independently of the above criteria where a confidential or fiduciary relationship exists between the testator and the beneficiary coupled with the existence of 'suspicious circumstances.' *Estate of Komarr* (1970), 46 Wis. 2d 230, 175 N. W. 2d 473; *Will of Cooper* (1965), 28 Wis. 2d 391, 137 N. W. 2d 93. . . ."

The court has applied the same four elements of the test of undue influence to set aside an *inter vivos* transfer. *Estate of Larsen* (1959), 7 Wis. 2d 263, 96 N. W. 2d 489.

The trial court's finding of undue influence will not be set aside unless it is against the great weight and clear preponderance of the evidence. *Casper v. McDowell* (1973), 58 Wis. 2d 82, 89, 205 N. W. 2d 753; *Johnson v. Mielke* (1970), 49 Wis. 2d 60, 81, 181 N. W. 2d 503.

On appeal there was much dispute between the parties regarding what the testimony at trial would support as a finding of fact by the trial court. One fact is unquestionably clear from the record in this case. The marriage of Ronald and Ethel was not ideal. There is substantial evidence that Ronald drank intoxicating liquor excessively, at least during the latter years of their marriage, and frequently physically abused his wife when he was under the influence of intoxicants. Counsel for the respondent was criticized for embellishing the abuse suffered by Ethel Ward in an attempt to create sympathy for her by the trial court. However, one of the material elements of undue influence is susceptibility. The fear that Ethel Ward had of her husband was very important in this regard. Ethel ultimately became involved with a particular religion, and there is evidence that Ronald violently opposed this activity.

Ethel Ward is a small woman, five feet tall, and weighing 96 pounds. At the time of the trial, she was forty-five years old, and her marriage to Ronald had produced six children: Carl, twenty-two, and Russell, twenty-one, both of whom were married and had homes of their own; Arthur, eighteen; Margie, fifteen; David, twelve; and Richard, eleven. Ethel Ward testified that when her husband came home under the influence of alcohol many times he would grab ahold of her arm and throw her out of bed—clear across the room. This happened at least once every two weeks. The situation became worse the three or four years before Ethel commenced an action for separate maintenance in 1970. It appears that Ethel did not believe in divorce, which she testified was scripturally recognized only in the case of adultery. During these latter years together, Ronald would slap her hard enough to knock her down and threatened to kill her several times. Ethel Ward described an incident with Ronald just before she left him in August, 1970,

where he almost carried through his threat to kill her. Ronald and Ethel were driving home from Boscobel, and Ronald was very angry at her. He told Ethel he would beat her into the floor when he got her home, and then stopped the car at a quarry, indicating that he could do it there so that she would not be able to summon the sheriff. Ronald walked around the car and put both of his hands on her throat and put her down on the seat, at which time a car was driven past and he walked back to where it was dark. When the car had passed, he came back to the car and took ahold of her again in the same manner, but another car came past. Ronald then drove her home and said he had to get out of there before he killed her because he knew that was what he was going to do. Ronald was out of town again that next week (Ronald's job oftentimes required that he be away during the week), and she was not alone with him again until Queram advised her to leave the home.

Ronald testified that he did not frequently physically abuse his wife the year before they separated in April, 1970, and that only once did Sheriff Ray Childs have to come to the house. On the other hand, Sheriff Childs testified that his office had been called on November 10, 1969, November 27, 1969, and on July 24, 1970, and on each occasion took Ronald into custody. Childs testified that on November 10th he went to the home and found Ronald standing with another man by the car and saw Ethel out by the barn. Ethel had been hit in the face and her face was starting to swell. Blood was running down her face and the cloth in her hand was bloody. Childs testified that Ronald appeared to be intoxicated and took a swing at him when he tried to arrest him. Ronald was charged with battery, pled guilty, and placed on probation to Childs for six months. As a result of the incident on November 27th, Ronald signed a voluntary commitment to go to Mendota for his drinking problem. He was transferred to the Veterans' Hospital

at Tomah and released. Childs also testified that in the years prior to November, 1969, he had been called out to the Ward home for similar incidents at least a dozen times.

Arthur Ward, the son of Ronald and Ethel, testified that he witnessed many arguments and fights; that Ethel never gave Ronald provocation; and that when he got older he would step in to prevent Ronald from hitting her. Arthur testified, "She loved him but Christ he scared the hell out of her."

Dr. C. H. Miller, the family physician, testified that it was his opinion that Ethel Ward was the type of person subject to duress or subject to being forced into submission. The record supports a finding that she was susceptible to his undue influence. In *Estate of Gaudynski* (1970), 46 Wis. 2d 393, 400, 175 N. W. 2d 272, it was explained as follows:

"All influence on a person to make certain provisions in a will is not undue. People in everyday life make up their minds because of the influence of others. People only act when motivated. An influence is only undue 'when it becomes so strong it overpowers and compels the exercise of the will of the person subjected to it.' *Will of Cooper* (1965), 28 Wis. 2d 391, 400, 137 N. W. 2d 93. The test is whether 'the free agency of the testator has been destroyed.' *Will of Faulks* (1945), 246 Wis. 319, 17 N. W. 2d 423. And it has been said 'A disposition to unduly influence a testatrix means something more than a mere desire to obtain a share of an estate. It implies a willingness to do something wrong or unfair.' *Estate of Phillips, supra; Estate of Knutson, supra.*"

Appellant argues that there was insufficient evidence to establish that Ronald had the opportunity to influence Ethel because they did not live together for a full three months before the deed was executed. It is true that Ronald moved out of the house when Ethel commenced her first action for separate maintenance. On July 7th,

Ronald was served with the complaint. The quitclaim deed was executed on July 20th. Ethel testified that in the week or so before the deed was signed, Ronald had come out to the farm and talked to her about reconciliation. She said that when Ronald told her to go down to Queram's office (the record reflects Ronald had already directed him to draw up the necessary papers) and sign the deed, that his voice was threatening.

Arthur Ward testified that he was aware that his father was talking to his mother about reconciliation the week prior to July 20th. He said Ronald told Ethel that they had to sign the farm back to Sadie; that ". . . he didn't ask her or anything—he told her to sign that —they should sign the farm back—there was no choice— he didn't offer a choice—I know he didn't."

Margie Ward, a daughter of Ronald and Ethel, also corroborated Arthur's testimony. Appellant's argument that Ronald was not living with Ethel during the weeks prior to July 20th and, therefore, did not have the *opportunity* to influence her, is without foundation. In *Winn v. Itzel* (1905), 125 Wis. 19, 33, 34, 103 N. W. 220, it was explained ". . . that 'opportunity' here does not mean mere physical propinquity or possibility of personal contact, but the fact that interviews or personal transactions between the parties were had, followed by the accomplishment of the desired end, . . ."

Ethel Ward went to Queram's office on July 20, 1970, at Ronald's direction, and Ronald and Sadie Ward were also present. Ethel testified that:

". . . Mr. Queram asked for me to come in and he talked about a reconciliation and I had misgivings of it even after I agreed to it—I had misgivings of it but he said it was worth a try isn't it and then he had Ron come in and then we did agree to a reconciliation."

Ronald had earlier testified that they had previously agreed to reconcile, but Ethel said that was not true.

Reconciliation and execution of the deed were accomplished the same day. After they agreed to reconcile, the papers were all ready to be signed. Ethel signed the quitclaim deed and an affidavit that she executed such deed voluntarily, without coercion, and not under duress. Ethel testified that she did not read the deed or the affidavit before she signed them and that she did not feel that she had a choice in the matter as to whether she should sign or not.

Ethel also testified that she had previously suggested to Ronald that they sell the farm, pay the balance due on the land contract to Ronald's mother, and still have enough to start fresh on a new place—perhaps smaller. Ronald denied this. Ronald never agreed to this and, instead, accused Ethel of trying to take the farm away from him.

". . . The disposition to influence is shown by 'a willingness to do something wrong or unfair, and grasping or overreaching characteristics.' . . ." *Casper v. McDowell, supra,* page 95.

Undue influence is by its very nature rarely susceptible of direct proof, although in this case Ethel did testify that she had no choice but to sign the deed, and this testimony is corroborated by that of several children. The record reflects that Ronald was worried about losing the farm after he was served with Ethel's complaint on July 7th. The fact that he directed Queram to draw up the papers and told Ethel to sign them clearly supports the trial court's conclusion that the deed was signed by Ethel while she was subject to his undue influence.

A coveted result is obvious. There was a balance due on the land contract of $5,746.84 ($10,000 — $500 down payment; $3,685.27 payments; and $67.89 miscellaneous payments). The balance due on the contract was canceled in exchange for the quitclaim deed. The farm was sold to Trumm for $32,000, cash, on February 4, 1971, just

before this action was commenced. Trumm, himself, sold the land approximately five months later, on July 18, 1971, for $54,000. Appellant argues that at the time the quitclaim deed was executed by Ethel, the land was not worth in excess of $30,000, as the trial court found. It is appellant's position that ". . . the two subsequent sales express no more than perfect consistency with the uncontradicted testimony (Ronald's) as to the· rapidly rising land values since the date of the quitclaim deed." However, if this land was only worth approximately $6,000 on July 20, 1970, it increased more than 500 percent in six months, and approximately 900 percent in less than one year. Transfers of such an unusual nature as this quitclaim deed, raise "a red flag of warning." *Estate of Culver* (1964), 22 Wis. 2d 665, 673, 126 N. W. 2d 536. Close and careful scrutiny of such a transaction, particularly when one considers the relationship of the parties, is required. 23 Am. Jur. 2d, *Deeds*, p. 195, sec. 149.

The result in this case is that Sadie Ward, who does not appear to be at fault in any way, does not receive all of the proceeds from the sale to Trumm. However, it is clear that she received that to which she was entitled—the balance due on the land contract—if the farm had been properly sold by Ronald and Ethel. It is generally recognized as follows:

"Where a deed was procured by undue influence, it is immaterial that in the procurement thereof the immediate beneficiary did not participate, or that a third person acted with the beneficiary in exercising such undue influence. This rule has been said to be essential to justice, since if it were otherwise, a designing person could escape the consequences of his wrong by causing conveyances to be made to third persons who would hold the property for him." 23 Am. Jur. 2d, *Deeds*, p. 198, sec. 153.

In *Will of Cooper, supra,* page 399, it was explained that ". . . [t]he concept of coveted result includes obtaining for oneself or another a benefit such person would normally not receive and its reception is unjust to someone else."

Sadie Ward testified at trial that her health was not too good and that she was eighty-two years of age. Ronald had been living with her much of the time when he and Ethel were having domestic problems. Her eyesight was failing her. Sadie testified that she did not know that Ronald and Ethel were going to deed the farm back to her and she had not discussed the matter with Ronald.

We conclude that the finding of undue influence at the time Ethel Ward executed the quitclaim deed is not against the great weight and clear preponderance of the evidence, and for this reason the judgment of the trial court is affirmed. Therefore, it is not necessary to further consider the other issues raised by the parties, or the additional findings of the trial judge.

*By the Court.*—Judgment affirmed.