WILL OF FREITAG: FREITAG, Appellant, v. SOLVERSON, Respondent.

*January 6—February 2, 1960.*

For the appellant there was a brief and oral argument by *Milton Spoehr* of Berlin.

For the respondent there was a brief by *L. Ira Krieser* of Princeton, and *Lueck & Skupniewitz* of Beaver Dam, and oral argument by *Mr. A. W. Lueck* and *Mr. Krieser*.

HALLOWS, J. The only issue on this appeal is whether the finding of the trial court that the will was a result of undue influence is against the great weight and clear preponderance of the evidence. We have said many times that a finding of fact made by a trial court may not be disturbed on appeal unless the findings are contrary to the great weight and clear preponderance of the evidence,

and it is not sufficient for reversal that contrary findings . might have been made with evidence in their support. *Weber v. Kole* (1959), 7 Wis. (2d) 107, 95 N. W. (2d) 784. See 1 Callaghan's Wis. Dig., Appeal and Error, p. 578, sec. 870.

It is well established that in order to void a will because of undue influence, four elements must be proved. Stated in capsule form these are: Susceptibility, opportunity to influence, disposition to influence, and coveted result. Stated more completely: 1. A person who is susceptible of being unduly influenced by the person charged with exercising undue influence; 2. the opportunity of the person charged to exercise such influence on the susceptible person to procure the improper favor; 3. a disposition on the part of the party charged, to influence unduly such susceptible person for the purpose of procuring an improper favor either for himself or another; 4. a result caused by, or the effect of such undue influence. *Estate of Fuller* (1957), 275 Wis. 1, 81 N. W. (2d) 64; *Will of Ehlke* (1943), 244 Wis. 115, 11 N. W. (2d) 497; *Will of Leisch* (1936), 221 Wis. 641, 267 N. W. 268; *Will of Schaefer* (1932), 207 Wis. 404, 241 N. W. 382; see 16 Callaghan's Wis. Dig., Undue Influence, p. 804, sec. 1. In a recent case this court applied these four elements as a test of undue influence to avoid an *inter vivos* gift. *Estate of Larsen* (1959), 7 Wis. (2d) 263, 96 N. W. (2d) 489.

While these elements must be proved by clear, satisfactory, and convincing evidence, it was pointed out in *Estate of Larsen, supra,* that in most cases proof of undue influence may and usually does rest solely upon circumstantial evidence. The nature and purpose of undue influence is such that it is usually exercised under cover or in secret with little or no opportunity for the presence of

disinterested parties. In *Will of Ehlke, supra,* we stated (p. 121) : ". . . undue influence may rest and usually does rest wholly upon circumstantial evidence." In *Will of Leisch, supra,* we stated (p. 648) : "The proof of undue influence generally rests in circumstantial evidence." In recognition of the difficulty of proving undue influence an additional rule is applicable that when three of the four elements are established by the required proof, only slight evidence as to the fourth element is necessary to prove its existence. *Elliott v. Fisk* (1916), 162 Wis. 249, 253, 155 N. W. 110; *Will of Walker* (1927), 193 Wis. 264, 271, 213 N. W. 626.

There is no question that the appellant had the opportunity to unduly influence his mother. She had lived with him in Milwaukee almost a year prior to her death. In the accident of April 19th she was badly injured. The appellant saw her on Sunday, the day after she entered the hospital. About 7 a. m. the next morning the appellant, then in Milwaukee, telephoned Philip Lehner, Jr., an attorney at Princeton, Wisconsin, to go to the hospital in Fond du Lac and make a will for his mother. There seemed to be some hurry about this. Mr. Lehner and his wife were old acquaintances of the deceased, and Mr. Lehner had just finished probating the estate of deceased's husband and had handled a business affair for the deceased and the appellant. The Lehners testified they visited with the deceased for some time and she was mentally competent. Reverend Schaatz, who visited the deceased at the hospital about the time she executed the will, testified that the deceased was not able to comprehend his questions in respect to the family and she was apparently hard of hearing and in a dazed condition. There is a conflict in the testimony of whether she wore her hearing aid at the hospital. The Lehners testified, however, that the will represented the instructions given to them at the time of

execution and was prepared by filling out a form executed in the presence of the Lehners and retained by Mr. Lehner for safekeeping. It was signed by the deceased with her mark because the deceased was unable to sit up in bed. The appellant was advised by Mr. Lehner that the will had been executed. Neither of the daughters was so advised.

The will on its face is not a natural disposition under the circumstances in this case. The two daughters were on friendly terms with their mother. For some time the deceased had lived with the respondent before moving to the appellant's home. The daughters visited the mother at the hospital, and Helen Champagne frequently telephoned her mother. There is no testimony why the daughters should not have shared in their mother's estate. There is some testimony that the deceased left everything to the appellant because he was going to take care of her. Mrs. Wessall, who was the deceased's nurse during June, 1958, while she was convalescing in Milwaukee, testified the deceased told her she was giving the farm to her son and that she was leaving money to her daughters. The will had already been made. At that time the deceased had no farm to convey, and the money which represented the balance of the purchase price was in a joint account with the appellant. Such remarks were inconsistent with the will as executed.

In its decision the trial court characterized the appellant as being a person of such disposition as would attempt to unduly influence his mother and he had started to do it even prior to the time his father died, and had taken every advantage of his position to exercise control and influence over his mother. The evidence warrants this finding by the trial court. On January 21, 1956, the deceased and her husband sold the farm near Princeton on a land contract to the appellant for $6,500. The down payment was $50 and the balance was to be paid in monthly instalments of

$50. The father died May 29, 1957. On January 18, 1958, an arrangement was made between the deceased and the appellant whereby the deceased conveyed the farm by deed to the appellant for $4,000. Apparently some adjustment was made in this amount at the time of the closing in Mr. Lehner's office, because the check was made out for only $3,487.60. To finance this purchase, the appellant mortgaged the farm to his aunt. The check of $3,487.60 belonging to the deceased found its way into the appellant's possession and, on April 3d, almost three months later, was deposited by him in his individual account in a Milwaukee bank. Eight days later the account was changed to a joint account between him and the deceased, and three days later $2,000 was withdrawn and put in a joint account of the deceased and appellant in another Milwaukee bank. These transactions were unknown to the daughters. On examination, the appellant first testified that the $4,000 had been turned over to his mother and he did not know what she did with it. He later testified that he deposited the money, but that it was his mother's idea. At all times prior to her death this money was never in the exclusive control of the deceased and within a month after her death the appellant changed the two joint bank accounts to his own name.

The appellant had a similar joint account with his father, the proceeds of which the two daughters did not share upon the father's death. The appellant made arrangements with Attorney Lehner, who had previously represented him, to draft the will for his mother, and he wanted confirmation of the fact when the will was completed. It is quite evident from the record that the appellant had discussed the matter of the will with his mother. The interest of the appellant in the will was shown by the fact that he had discussed the will with a friend of his, Mr. Schneider.

The testimony also shows the appellant took care of whatever financial affairs the deceased had, and she apparently relied upon him for such services. Most of the activities of the appellant are shrouded in secrecy. The evidence also justifies an inference that the appellant was not on particularly friendly terms with his sisters and kept information about their mother from them. He failed to advise them of the accidents and refused to give the respondent information regarding her mother's condition after the last accident. The merits of the two automobile accidents in which the deceased and the appellant were involved do not appear in the record, but it does appear that nothing has been done to press a claim, if any, on behalf of the deceased. There is a sharp conflict of the testimony to the effect that the appellant had threatened to put the deceased in an old people's home.

The last element to be considered is whether the deceased was susceptible to undue influence by the appellant. There is testimony that she was easily led or swayed by people about her. Mr. Ed Mevis, a banker in Princeton, who knew the deceased very well and who stated she had done some banking at his bank, testified she was a person who could be easily influenced and she abided by the wishes of her husband and her children. The appellant testified that his mother was not the kind of person to argue. The grandson, who lived with the deceased on the farm during the summer of 1957, testified that on some occasions his grandmother gave him money and told him not to tell the appellant, and on one occasion when some gladiola bulbs were sold he was also told to keep it a secret from the appellant. A friend of the deceased's, Mrs. Storey, testified she spent two weeks' vacation at the farm with the deceased during August, 1958. She stated that the deceased talked about selling a washing machine, but she did not know whether

she should because she did not think the appellant would like it.

There is other testimony in the record but to recount it all would unduly lengthen this opinion. The evidence must be considered as a whole. In undue-influence cases the opinion and the findings of the trial court, its interpretation of the facts, and its determination of the credibility of the witnesses are of great importance on appeal. Proof of undue influence or fraud is rarely shown by direct proof—it is usually found as an inference from other facts, generally circumstantial, which may be sufficient to meet the required burden of proof. *McMynn v. Peterson* (1925), 186 Wis. 442, 201 N. W. 272; *Bibelhausen v. Bibelhausen* (1915), 159 Wis. 365, 150 N. W. 516. We conclude the trial court's findings are supported by clear, satisfactory, and convincing evidence and are not against the great weight and clear preponderance of the evidence.

*By the Court.*—Judgment appealed from is affirmed.

MARTIN, C. J., and DIETERICH, J., dissent.