ESTATE OF FRANK BREHMER: EUGENE BREHMER,
Appellant, v. DEMIEN, Executrix, Respondent.

*No. 89. Argued January 2, 1969.—Decided February 4, 1969.*
(Also reported in 164 N. W. 2d 318.)

For the appellant there was a brief and oral argument by *William A. Ketterer* of Milwaukee.

For the respondent there was a brief by *Frank & Hiller* of Milwaukee, and oral argument by *Herbert M. Hiller*.

CONNOR T. HANSEN, J.   It is well established that in order to void a will because of undue influence, the objector must prove four elements:

*Susceptibility*—a person who is susceptible of being unduly influenced by the person charged with exercising undue influence.

*Opportunity*—the opportunity of the person charged to exercise such influence on the susceptible person to procure the improper favor.

*Disposition*—a disposition on the part of the party charged to influence unduly such susceptible person for the purpose of procuring an improper favor either for himself or another.

*Coveted Result*—a result caused by, or the effect of, such undue influence. *Will of Freitag* (1960), 9 Wis. 2d 315, 317, 101 N. W. 2d 108.

". . . the gist of the attack upon the will is fraud, and the rule applies that, he who alleges fraud must establish it, not by a mere preponderance of, but by clear and satisfactory, evidence, . . ." *Ball v. Boston* (1913), 153 Wis. 27, 35, 141 N. W. 8.

The burden is upon the objector to prove by clear, satisfactory and convincing evidence that the will was a result of undue influence. However, in recognition of the difficulty of proving undue influence an additional

rule is applicable. When three of the four elements are established by the required proof, only slight evidence as to the fourth element is necessary to prove its existence. *Will of Freitag, supra,* page 318.

The determination by the county court that the will of Frank J. Brehmer was not the result of undue influence is not contrary to the great weight and clear preponderance of the evidence.

The testator died May 18, 1967, at the age of ninety years. His wife predeceased him in January, 1965.

Frank J. Brehmer was survived by his son Eugene, who was married and had an adopted daughter; and his daughter Evelyn, the proponent of the will, who was married and had a daughter.

The family circumstances changed over the years and decedent executed different wills in 1954, 1963 and 1966.

Eugene and his father occupied the same premises, which the father owned on Cora avenue, in carrying out their respective businesses. This arrangement continued from 1936 to the fall of 1963. Eugene and his wife also lived in the building and in lieu of rent, paid the property taxes, insurance and upkeep. Eugene also made some improvements to the building, and for that reason the deceased bequeathed 25 percent of the value of the property to him in the 1954 will.

In the fall of 1963, the relationship between the father and son began to deteriorate. It was at this time that Evelyn saw the 1954 will and told her father she did not think it was fair because Eugene was to receive 25 percent of the Cora avenue property. This resulted in the execution of the 1963 will.

Shortly after the execution of the 1963 will, the testator informed Eugene he was going to sell the Cora avenue property, and Eugene was given the first chance to purchase it. He offered $16,000, which the deceased termed "ridiculous." Eugene later acknowledged in a letter to his mother that the offer was ridiculous, but

that he really did not want to buy the property. In 1965, it was appraised at $25,000.

The relationship between Eugene and his father did not improve. At the end of 1963, Eugene moved his business and his home to another location.

However, after decedent's wife died in 1965, he went to live with Eugene. This arrangement lasted six months, at which time Eugene asked his father to move. The record indicates that this move was partly because the arrangement was disrupting Eugene's family life and partly because the deceased insisted on receiving receipts for the $40 per month room and board he was paying Eugene. It appears Evelyn told the deceased to request such receipts.

He executed the 1966 will about four months after being requested to leave his son's home.

The testator returned to the Cora avenue property where he lived alone for the last seventeen months of his life. During this period of seventeen months Eugene saw his father 10 or 15 times. He had no qualms about the deceased "fending for himself." Testator prepared his own meals and stoked a coal furnace located one floor below his living quarters. He also carried on a limited amount of his church goods business until his death. A neighbor testified that he and the decedent frequently discussed current events and that he knew the decedent was carrying on some business because he could see and hear him typing.

On the other hand, Evelyn had considerable contact with the deceased during the last seventeen months of his life. She cleaned his apartment once a week, did his laundry and ironing and helped him in his business. In 1966, she stayed with him two days when he was ill, and she called him every noon.

The first will which was executed in 1954 made provisions for testator's wife and then left his estate in equal shares to the son and daughter, except that prior to the

equal division of the estate Eugene was to receive 25 percent of the value of the building located on East Cora avenue in recognition of improvements made to the property by Eugene.

In the fall of 1963, Evelyn was told by her daughter and son-in-law that friends in Florida had warned that Evelyn had better watch out for Eugene or nothing would be left in her parents' estate for her.

The deceased then showed Evelyn the 1954 will and Evelyn testified before a court commissioner that she told her father that she did not think the 1954 will was fair. Evelyn then made arrangements to take her father to an attorney's office. October 2, 1963, the second will was executed. This will also made provisions for his wife and, in the event she predeceased the testator, left the estate to Eugene and Evelyn in equal shares, with the exception that $1,000 per year was to be deducted from the share of the son for each subsequent year in which Eugene occupied any real estate owned by the testator. Prior to the execution of this will, Evelyn prepared a typewritten statement of her relationship with her parents and also one of Eugene's relationship with his parents. A reasonable conclusion from the reading of the two statements is that Evelyn's is more favorably written than Eugene's.

The third and last will of the deceased was drafted by members of the same law firm that drafted the 1963 will and was executed on March 14, 1966. It made the following dispositions:

$2,500 to his son-in-law, Roland A. Demien.

$5,000 to his granddaughter, Deanna Bartkowiak (daughter of Evelyn and Roland Demien).

All the rest, residue and remainder to his daughter, Evelyn Demien.

*"Fourth:* I have in mind my son, EUGENE BREH- MER, but based upon his present age, the fact that he has

no natural children, and happenings of the past, I specifically make no provision for him . . . ."

It is undisputed that the testator went to the attorneys who drafted his 1966 will on his own volition. Attorney Bratt and Attorney Padden were the only persons present with the testator during the hour that he spent at the law office discussing the provisions of the will and executing it.

Both attorneys testified at the trial. Because the testator was eighty-nine years of age at the time of the execution of the will and disinherited his son, shortly after Brehmer left the law office Attorney Padden dictated a memorandum concerning the execution of the will. The memorandum was introduced into evidence. Its contents support the testimony of both Mr. Bratt and Mr. Padden. Both lawyers questioned Brehmer as to his assets, his children and grandchildren. He was very alert and aware of his circumstances. He desired to change his will because Eugene had no natural born children of his marriage, he was fairly well off and didn't need any money from him. The record supports the fact that Eugene is in better financial circumstances than Evelyn. He knew the extent of his assets and the objects of his affection. He came to the law office unassisted. Mr. Padden was of the opinion, and so wrote, that "He is a remarkable man and he is obviously of sound and disposing mind . . . he definitely understood the nature of his act. Mr. Brehmer was neatly dressed and was an entertaining and excellent conversationalist."

The only indication of any lack of memory on the part of the deceased at the execution of the 1966 will is the fact that he referred to Eugene's age as seventy when in fact he was sixty-one.

The objector did not meet the burden of proof required to prove the four elements necessary to void the 1966 will because of undue influence.

There is no question that the relationship between the testator and his daughter was such that she had the opportunity to unduly influence her father. While the testator was living alone, during the last seventeen months of his life and during which period the will was executed, she had almost daily contact with the deceased. A review of the decisions of this court reflect that such a relationship would support a finding of sufficient opportunity to unduly influence the testator.[1]

The record also supports a finding that there was slight evidence of testator's susceptibility to undue influence. The 1954 and 1963 wills indicate that he was receptive to the suggestions of his son and daughter.

Eugene admitted that he was primarily responsible for the inclusion of the provision in the 1954 will which gave him 25 percent of the Cora avenue property. The 1963 will was executed after the daughter learned of the 1954 will and indicated to her father that it was unfair and that the estate should be divided equally between her and her brother.

However, there is nothing in the record to indicate that the 1966 will was not executed of the testator's own free will and accord. The record does not disclose that he was suffering from any particular physical or mental aberrations which would increase the likelihood of susceptibility. He went to the drafting attorneys on his own initiative and gave rational explanations of why he wished to divide the estate the way he did.

"Disposition" means something more than a mere desire to obtain a share in another's estate. It implies a willingness to do something wrong or unfair, and grasping or overreaching characteristics. *Estate of Knutson* (1957), 275 Wis. 380, 387, 82 N. W. 2d 196. We find nothing in the record to support a finding that as to the 1966 will the daughter was disposed to influence the testator for the purpose of procuring improper favor.

[1] 1968 Wis. L. Rev. 569, 580.

Furthermore, the diligence exercised by the two attorneys who participated in the drafting and execution of the 1966 will is of particular importance. "Undue influence to render a will invalid must operate at the particular time of its execution." *Estate of Yahn* (1951), 258 Wis. 280, 282, 45 N. W. 2d 702. While on its face the terms of the 1966 will might indicate the exercise of undue influence because the natural objects of the testator's bounty did not share equally, the record indicates several reasons for the disinheritance of the son.

The last element to be considered is that of a coveted result caused by, or the effect of, such undue influence. The only specific evidence in the record is the testimony of the daughter which led to the execution of the 1963 will. She believed the 1954 will to be unfair and that the estate should be divided equally between her and her brother. There is nothing in the record to indicate anything improper in the execution of the 1966 will. The 1966 will was executed approximately four months after the testator was requested to leave his son's home. The testator also gave several reasonable explanations to the lawyers drafting the 1966 will for disinheriting his son.

The appellant has not demonstrated undue influence by clear, satisfactory and convincing evidence, and the trial court's findings are not against the great weight and clear preponderance of the evidence.

*By the Court.*—Order affirmed.