CASPER (Richard) and another, Appellants, v. Mc-
DOWELL, Respondent. [Case No. 3.]

ESTATE OF CASPER (Joseph) : CASPER (Alger) and an-
other, Appellants, v. FIRST NATIONAL BANK OF
KENOSHA, Executor, and another, Respondents.
[Case No. 4.]

*Nos. 3, 4.   Argued February 26, 1973.—Decided April 9, 1973.*
(Also reported in 205 N. W. 2d 753.)

84

For the appellants there was a brief by *Ray T. McCann* and *Richard A. McDermott,* both of Milwaukee, and oral argument by *Mr. McDermott.*

For the respondents there was a brief by *Whaley & Whaley* of Racine, and oral argument by *John V. Whaley.*

WILKIE, J.   Two issues are presented on this appeal:

1.   Did the trial court err in refusing to strike the testimony of the scrivener-witness, Attorney Leo E. Vaudreuil?

2. Is the trial court's determination of no undue influence in the preparation and execution of the will and the jury's similar determination in the effort to void the *inter vivos* transfers supported by the record?

### *Testimony of Attorney Leo Vaudreuil.*

Appellants argue that paragraph sixth of the will, which provides that the executor employ the Vaudreuil law firm for legal assistance in probating the estate,[2] created an interest in that law firm within the contemplation of sec. 885.16, Stats., this state's dead man's statute.[3] As a result of the creation of this "substantial" interest, appellants contend that it was error for the trial court not to strike Vaudreuil's testimony concerning

[2] The sixth paragraph of Casper's will provides: "It is my will and I hereby direct that the executor of this my last will and testament shall employ Vaudreuil & Vaudreuil, or the surviving member of said firm, of Kenosha, Wisconsin, for legal advice and assistance in the probate and carrying out of the provisions of my last will and testament."

[3] Sec. 885.16, Stats., provides: **"Transactions with deceased or insane persons.** No party or person in his own behalf or interest, and no person from, through or under whom a party derives his interest or title, shall be examined as a witness in respect to any transaction or communication by him personally with a deceased or insane person in any civil action or proceeding, in which the opposite party derives his title or sustains his liability to the cause of action from, through or under such deceased or insane person, or in any action or proceeding in which such insane person is a party prosecuting or defending by guardian, unless such opposite party shall first, in his own behalf, introduce testimony of himself or some other person concerning such transaction or communication, and then only in respect to such transaction or communication of which testimony is so given or in respect to matters to which such testimony relates. And no stockholder, officer or trustee of a corporation in its behalf or interest, and no stockholder, officer or trustee of a corporation from, through or under whom a party derives his or its interest or title, shall be so examined, except as aforesaid."

the competency of Joseph Casper at the time his last will and testament was executed. Appellants are convinced the will could not have been admitted to probate absent this testimony.

We do not reach the question of the applicability of the Wisconsin's dead man's statute, which has been recently criticized and the proposed repeal of which is pending before this court.[4] In the first place, appellants waived the protection of that statute by failing to object to the testimony of Leo Vaudreuil until two days after it was admitted into evidence. While this objection was properly framed in terms of the competency of the witness-scrivener, Attorney Vaudreuil, it was far too late to be considered a timely objection.

Then, too, when Attorney Leo Vaudreuil testified during the first day of the four-day trial he was extensively cross-examined at that time. In *Estate of Molay* [5] this court favorably quoted Mallare's observation in *Wisconsin Civil Trial Evidence* that any conduct inconsistent with the objection waives such objection:

"'When the party elects to cross-examine the witness about the transaction rather than object, he waives the protection of the statute. . . .'"

Appellants' argument concerning sec. 885.16, Stats., is also falsely premised because this court has consistently refrained from extending the statute's prohibition to those who do not "'gain or lose by the direct legal operation and effect of the judgment, or that the record will

[4] *Estate of Molay* (1970), 46 Wis. 2d 450, 458, 175 N. W. 2d 254. *See also:* Currie, *Transactions with Deceased Persons,* 1948 Wis. L. Rev. 491, 505.

The Judicial Council's Rules of Evidence Committee recommends the following in the *Proposed Wisconsin Rules of Evidence:* "The Dead Man's Statutes, ss. 885.16 and 885.17, are repealed as circumscribed relics of the obsolete principle of disqualification for interest." 56 Marq. L. Rev. (1973), 155, 279.

[5] *Supra,* footnote 4, at page 460, citing Mallare, *Wisconsin Civil Trial Evidence,* page 24, sec. 1.663.

be legal evidence for or against him in some other action.' " [6] Thus, executors,[7] trustees,[8] and other agents [9] have been held competent to testify under this statute despite the fact that each may receive fees for his service as a result of the testamentary instrument.[10] In *Estate of Thayer* [11] this court stated:

"While in *Ogg, supra,* page 192, we concluded that the attorney named in the will, but not retained by the executor, was a ' "person aggrieved" by the orders appealed from within the meaning of sec. 324.01, Stats.' we cannot equate the naming of an attorney to probate a will to constitute or be encompassed within the terms, 'beneficial devises, legacies and gifts.' At most it constitutes a direction to hire on the basis of recognized fee schedules of the locality. It cannot be presumed that the retainer is a windfall. Rather, it presupposes that compensation will be made only on the basis of the value of services rendered."

Appellants attempt to distinguish *Thayer* from the instant case on the basis that there the issue was the right of individual beneficiaries to name an attorney for the executor and trustee and that there was no will contest involved. This is no distinction. It simply does not stand to reason that an attorney named to assist in the probate of a will is likely to be unduly tempted to "falsehood and

[6] *Estate of Novak* (1923), 181 Wis. 16, 18, 193 N. W. 1000, quoting from 1 Greenleaf, *Evidence,* sec. 390. The *Estate of Novak* holds that the disqualifying interest must also be " 'present, certain, and vested.' "

[7] *Anderson v. Laugen* (1904), 122 Wis. 57, 63, 99 N. W. 437.

[8] *Estate of Novak, supra,* footnote 6, at page 18.

[9] *In re Downing's Will* (1903), 118 Wis. 581, 593, 95 N. W. 876 (scrivener); *Lowry v. Lowry* (1933), 211 Wis. 385, 388, 247 N. W. 323, 248 N. W. 472 (deliverer of gift); *Renich v. Klein* (1939), 230 Wis. 123, 130, 283 N. W. 288 (truck driver).

[10] *See generally,* Currie, *Transactions with Deceased Persons, supra,* footnote 4, at pages 497–501.

[11] (1968), 41 Wis. 2d 55, 63, 64, 163 N. W. 2d 142. *See also: Will of Henderson* (1956), 272 Wis. 163, 165, 74 N. W. 2d 739.

concealment" by what was denominated in *Estate of Thayer* as "recognized fee schedules of the locality." [12] This is not a sufficient " 'gain or [loss] by the direct legal operation and effect' " of the transaction with the deceased person. [13] Neither do we consider that it makes any difference where the testator names a law firm instead of an individual attorney, though the latter is the preferred way of making the designation.

## Undue influence.

Appellants' second major contention is that the findings of no undue influence, as made by the trial court in the will contest and by the jury in the challenge to the *inter vivos* transfers, are not supported by the evidence.

The test for reviewing the trial court's findings is whether they are against the great weight and clear preponderance of the evidence. [14] The test for reviewing the jury's findings is whether the findings are supported by credible evidence. [15] In this controversy we apply the standard for reviewing the trial court's findings since it follows that if the findings are not against the great weight and clear preponderance of the evidence they must necessarily be supported by credible evidence. The trial court entered findings denying the contention that the will was procured by undue influence exercised over Casper by Wilma Jean McDowell. The court stated:

"The court is satisfied that a clear preponderance of the evidence has established that the instrument pro-

[12] *Supra,* footnote 11, at page 64.

[13] *Supra,* footnote 6. *See also: Johnson v. Mielke* (1970), 49 Wis. 2d 60, 71, 181 N. W. 2d 503.

[14] *Estate of Velk* (1972), 53 Wis. 2d 500, 506, 192 N. W. 2d 844. *See also: Will of Dobson* (1951), 258 Wis. 587, 590, 46 N. W. 2d 758.

[15] *Delaney v. Prudential Ins. Co.* (1966), 29 Wis. 2d 345, 349, 139 N. W. 2d 48.

posed as the last will and testament of Joseph Casper was executed in the manner provided by law; that the said Joseph Casper was, at the time of execution of said will, of sound and disposing mind and memory; that he was of sufficient mental capacity to make a will; and, that said will was not procured by undue influence exercised over him by Wilma Jean McDowell."

Although these findings are indeed "sketchy" [16] in this case we do not approach our review of the findings de novo as suggested by the appellants. This is due to the fact that there are jury findings in one case which can be reviewed as against the actual record. If it were not for the fact that the fundamental finding of "no undue influence" was made by the jury here we would remand the proceedings to the trial court for the making of more detailed findings and conclusions. [17]

This court has often reiterated the elements necessary to establish undue influence. [18] The same four elements have also been held applicable to set aside *inter vivos* transfers. [19] In *Will of Freitag* they were capsulized as follows:

". . . Susceptibility, opportunity to influence, disposition to influence, and coveted result. Stated more completely: 1. A person who is susceptible of being unduly influenced by the person charged with exercising undue influence; 2. the opportunity of the person charged to exercise such influence on the susceptible person to procure the improper favor; 3. a disposition on the part of

[16] *Estate of McGonigal* (1970), 46 Wis. 2d 205, 218, 174 N. W. 2d 256.

[17] *State ex rel. Skibinski v. Tadych* (1966), 31 Wis. 2d 189, 199, 142 N. W. 2d 838; *Walber v. Walber* (1968), 40 Wis. 2d 313, 319, 161 N. W. 2d 898; *Jacobs v. Jacobs* (1969), 42 Wis. 2d 507, 512, 513, 167 N. W. 2d 238.

[18] *See, e. g., Ball v. Boston* (1913), 153 Wis. 27, 141 N. W. 8; *Will of Jackman* (1870), 26 Wis. 104, 111, 112; *Estate of Gaudynski* (1970), 46 Wis. 2d 393, 400, 175 N. W. 2d 272.

[19] *Estate of Larsen* (1959), 7 Wis. 2d 263, 269, 96 N. W. 2d 489.

the party charged, to influence unduly such susceptible person for the purpose of procuring an improper favor either for himself or another; 4. a result caused by, or the effect of such undue influence." [20]

These elements must be proven by the objector by "clear, satisfactory and convincing evidence that the will or gift was the result of undue influence." [21]

Before analyzing the proof as to each of the four elements of undue influence, a brief overview of the life of the testator is in order.

Joseph Casper was born in Lithuania in approximately 1892. He was a man of limited education and came to this country in 1913. Casper settled in Kenosha and was joined by his two brothers a year later. Casper worked as an assembler at Vincent McCall for forty years. He also worked for ten years for American Motors.

Casper's first marriage ended in divorce in the early 1930's. Two sons were born of this marriage, Alger and Richard. After the divorce the sons lived with their mother but continued to see their father. Both sons eventually moved to California in the 1950's. Joseph Casper remarried but there were no children of this marriage. His second wife instituted divorce proceedings against Casper in 1950 but they were reconciled. His second wife died in 1958.

According to Harry Myers, a stockbroker, the testator invested in the stock market intermittently over the last thirty years of his life. Myers stated that Casper made money on each of his trades.

Casper lived alone for several years after his second wife died. His brother, John, rented the upstairs part of the residence from 1957 to 1963. John testified he helped testator with the household chores. In October, 1964, the

[20] *Will of Freitag* (1960), 9 Wis. 2d 315, 317, 101 N. W. 2d 108. *See also: Estate of Brehmer* (1969), 41 Wis. 2d 349, 351, 164 N. W. 2d 318.

[21] *Johnson v. Mielke, supra,* footnote 13, at page 80.

testator placed an advertisement in the Kenosha news-paper for a housekeeper. Wilma Jean McDowell, also known as Jean McDowell, then twenty-two years old, answered Casper's advertisement. She was one of six children of Moses and Ethel McDowell. Prior to becoming Joseph Casper's housekeeper, Jean worked at several jobs for varying lengths of time. Starting this new employment in 1964, she moved into the Casper home. Aside from a couple of short vacation trips, regular visits to her parent's home in Kenosha, and a brief hospitalization, Jean McDowell continuously resided in the testator's home until his death in 1970. Although Jean McDowell testified that she had not had sexual relations with the testator, several witnesses testified the two were intimate.

The state of Joseph Casper's health was described by several witnesses as deteriorating during the last five years of his life. He was hospitalized in 1963 for the removal of a cancer of the tongue, and in 1968 for chest pains. Casper's physician, Dr. Charles A. Pechous, Sr., testified that Casper's health had never been good and that he had chronic heart disease. Casper took nitro-glycerine and cardilate medications to ease his chest pains. Dr. Pechous testified that Casper had often experienced hypertrophic gastritis—an irritation of the stomach. The doctor classified the testator as a Class 3 cardiac patient (in a classification of 1 to 4, Class 4 would signify total incapacity).

In July and August, 1968, Jean McDowell drove the testator to the various banks and savings and loan associations wherein he had accounts. Casper had the accounts made into joint accounts with himself and Jean McDowell. The joint accounts initially conditioned withdrawal by Jean McDowell upon Casper's permission. These conditions were subsequently voided, however. The First Federal Savings & Loan Association of Racine account application form, on June 2, 1964, designated Linda

Corn as beneficiary. This was voided the following month. The application also states "3–1–65 Payable on death to: Jean McDowell." It is signed by Joseph Casper and witnessed with two signatures.

On July 24, 1969, Jean McDowell drove Casper to the law offices of Vaudreuil and Vaudreuil. Leo Vaudreuil assisted Casper in drawing up his will. Jean McDowell waited in the car while Casper was in the Vaudreuil law office. The will named Jean's father as executor. In the event of his unavailability, her brother was to act as executor. The will bequeathed $1,500 to each of Casper's two sons, and the remainer of the estate was left to Jean McDowell. She stated that on the way to and from the law office she and Casper did not talk in any way about the will or the subjects covered by it.

Prior to Jean McDowell's residing in the Casper home, testator had corresponded with and received visits from his sons. There was very little contact after 1965. One son, Richard, testified that while he returned to Kenosha every year from 1965 to 1970, he did not visit his father on any of those trips. The other son, Alger, testified that in 1965 he received a letter from his father advising him he had married a young girl. (Casper and Jean McDowell were never married.) The letter also asked Alger not to visit him. The testator's brother, John, testified that after 1965 he did not see his brother very often.

A. *Susceptibility*. As evidence of Joseph Casper's susceptibility to undue influence, appellants cite his deteriorating physical condition, his dissociation from family members, former friends and associates and his inordinate attraction to this young girl. Testimony from various witnesses regarding Casper's odd conduct included his failure to recognize a grandchild and an old friend; his cutting off the top of several of his trees and one of his neighbor's trees; the severe cutting of his hand by placing it in his lawn mower. Appellants also cite as conclusive

proof of susceptibility a boast made by Jean McDowell to a neighbor that she could get anything she wanted from Casper.

The prevailing evidence, however, is that Joseph Casper was a strong-willed and independent person. A neighbor, Frank Novelen, stated:

"Well, he had a mind of his own. . . . Yeah, I'd say if he wanted to do something, he'd do it."

Novelen stated, however, that after 1967 Casper was not as alert as formerly and was more easily influenced. Novelen's wife testified that during the last year of his life Casper, in response to her commenting upon the weeds in his lawn, stated "Oh, let them be, they're green."

Leo Vaudreuil testified that he questioned the testator about leaving only $1,500 to each of his sons. Casper told Vaudreuil that he had very little to do with his sons since his divorce and that Jean McDowell was good to him.

John L. Schanock testified that he met Casper when the two of them drove to the Mayo Clinic together in 1958. He stated the two men shared a common interest in real estate. After 1965, however, Casper's interest, according to Schanock, turned to love. The frequency of their contacts diminished significantly after Jean Mc-Dowell moved in.

Keith Lindahl, a former tenant of Casper's, testified that when he resided at the Casper residence in 1964 and 1965 the testator was alert and well-oriented; that he was a strong-willed fellow. Lindahl testified that Casper, despite his heart condition, only reluctantly permitted him to shovel the snow.

Perhaps best summarizing Casper's independence is a statement made about snow shoveling to his neighbor, Frank Novelen, on the day of his death. Responding to a comment by Novelen: " 'Joe, don't shovel, it's pretty heavy.' . . . 'You didn't put it there' . . . 'and you don't

have to remove it. Let the Good Lord remove it,' " Casper stated " 'Oh, I take a pill, I put it under my tongue, then I can do anything.' " Shortly thereafter, Casper was found dead in his driveway.

Casper's stockbroker, Harry Myers, testified he had talked with Casper a couple of days before his death. According to Myers the two men had a conversation for fifteen minutes concerning the stock market. Myers stated the only difference he perceived in Casper was that his hair was a "shade grayer than the time I'd seen him before."

His personal physician testified that, in his opinion, Casper was "orientated" during the fourteen years they were acquainted. He had last seen Casper on December 16, 1968. In *Estate of McGonigal* it was considered that the fact that both the testatrix's doctor and attorney concurred in opining that the testatrix was not confused or subject to undue influence at the execution of the will "cannot be minimized." [22]

We conclude from this evidence that Casper, during the last half dozen years of his life, did not lose his characteristic independence. He was not susceptible to undue influence as claimed by the appellants. While his health declined with age, his mental condition did not deteriorate severely.

B. *Disposition.* The disposition to influence is shown by "a willingness to do something wrong or unfair, and grasping or overreaching characteristics." [23] Not every act of kindness may be considered as indicating a disposition to influence a testator. In *Estate of McGonigal* we noted "There is nothing wrong with aiding and comforting a failing testator; indeed, such activity should be encouraged." [24]

---

[22] *Supra*, footnote 16, at page 213.

[23] *Estate of Brehmer, supra*, footnote 20, at page 356. *See also: Will of Schaefer* (1932), 207 Wis. 404, 415, 241 N. W. 382.

[24] *Supra*, footnote 16, at page 214.

As evidence of Jean McDowell's disposition to unduly influence the testator appellants cite her statement to a neighbor that she could get anything she desired from the testator, her character as evidenced by her living with a man of advanced years, her alienating Casper from his friends and relatives, and her apparent lack of remorse upon learning of Casper's death.

While Jean McDowell's aid and comfort to Joseph Casper may have exceeded that which is normally expected of a nurse or housekeeper, this fact, standing alone, does not require the inference of a disposition to unduly influence.

While Casper's diminished contacts with his friends and family may give rise to the suspicion that Jean McDowell was "poisoning" the testator's mind, such inference or suspicion is not necessarily true. Casper's friend, John Schanock, stated that he felt Casper's interests simply turned to love. Quite natural is Casper's diminished need to depend upon friends and family after Jean McDowell's arrival. The two, despite several spats, were quite close. Former tenants testified they would hear Casper and Jean McDowell talking well into the morning. Casper variously referred to his housekeeper as "honey," "friend" and "wife." Mrs. Josephine Casper, testator's sister-in-law, testified that Jean McDowell stated, on the day of Casper's death, "Yeah, I had some boyfriend[s], but this is my best boyfriend."

One incident that has an important bearing on the charge that Jean McDowell turned Casper away from a close relationship with his friends and family is Casper's handling of the savings account at First Federal Savings & Loan Association of Racine. We have already noted that on June 2, 1964, he designated Linda Corn as beneficiary of this account. She was not a member of Casper's family or circle of friends. This indicates that Casper, although maintaining contact with friends and family,

did not regard them as potential recipients of his bounty even before he and Jean McDowell met.

Appellants also point to Jean McDowell's evident lack of sorrow on the day of Casper's death. According to several witnesses, she was inordinately interested in getting into the house and securing her clothes and a silver box wherein Casper's will and other documents were kept. This fact, appellants imply, indicates Jean McDowell's paramount financial interest in Joseph Casper. Although this evidence does indicate Jean McDowell was aware of her position as beneficiary of Casper's property, and it also indicates that she was concerned with protecting that property interest, it does not unequivocally indicate that she was disposed to unduly influence Casper.

C. *Coveted result.* This court in *Estate of McGonigal* outlined the nature of this element of undue influence:

"The question for consideration here is whether the result obtained was caused by or was the effect of undue influence. What is under scrutiny here is the naturalness or expectedness of the bequest." [25]

At first blush, the will and *inter vivos* transfers in the instant case appear unnatural. Indeed, as stated in *Estate of Culver,* they raise "a red flag of warning." [26] It does not automatically follow, however, that Joseph Casper's giving the majority of his wealth to nonkin is unnatural.[27] The naturalness of a will depends upon the circumstances of each case.[28]

Here, the testator's closest kin, his two sons, lived in California and had for many years. Although the record here doesn't establish precisely why the relationship with

[25] *Supra,* footnote 16, at page 216.

[26] (1964), 22 Wis. 2d 665, 673, 126 N. W. 2d 536.

[27] *Estate of Steffke* (1970), 48 Wis. 2d 45, 49, 179 N. W. 2d 846.

[28] *Estate of Velk, supra,* footnote 14, at page 511.

the sons fell off after 1964, it is clear that it did. Casper no longer desired to see his sons or their families. It appears that Casper's closest friend was Jean McDowell. Indeed, soon after she began living with Casper, he wrote to his son Alger that he was happy with his "wife" and that he no longer desired to see him as it could make trouble with her parents.

Although there is a claim that Casper deviated from socially acceptable behavior for a man of his age in hiring Jean McDowell, fifty years his junior, as a resident housekeeper and in considering her as his closest friend through his last years, this does not necessarily lead to but one inference that his giving the majority of his estate to her was an unnatural testamentary result obtained by undue influence.

We have said:

". . . Granted that a man may not measure up to the approved standard in morality, that does not deprive him of the right to dispose of his property as he pleases, so long as it is evident that the will expresses the free intent and purpose of the testator." [29]

D. *Opportunity.* The only element of the four essential to a finding of undue influence that is present here is the "opportunity" to influence the testator. Joseph Casper and Jean McDowell lived under the same roof for approximately five and one-half years. They enjoyed a close relationship. Beyond question, Jean McDowell had the opportunity to exercise influence had she the inclination.[30] This is true regardless of the fact that Jean McDowell was not actually present at the will's execution.

We conclude that (1) the trial court's finding here that there was no undue influence in procuring the execution of the will is not contrary to the great weight

[29] *Will of Golz* (1926), 190 Wis. 524, 527, 209 N. W. 704. *See also: Estate of Burns* (1964), 23 Wis. 2d 175, 181, 127 N. W. 2d 239.

[30] *See, e. g., Johnson v. Mielke, supra,* footnote 13, at page 80.

and clear preponderance of the evidence and (2) the jury's findings as to no undue influence as regard the deposit certificates and bank account are supported by credible evidence.

*By the Court.*—Order and judgment affirmed.