IN RE ESTATE OF KAMESAR, Deceased: LEE, Personal Representative of Estate of Samuel Kamesar, Deceased, Respondent, v. KAMESAR, and another, Appellants.

*No. 75–504. Submitted on briefs September 1, 1977.—*
*Decided November 30, 1977.*
(Also reported in 259 N.W.2d 733.)

152

For the appellants the cause was submitted on the brief of *Irving Lowe,* attorney, and *Richard J. Rakita,* of counsel, both of Milwaukee.

For the respondent the cause was submitted on the brief of *Kenney, Krembs, Fellows and Wolfe* of Milwaukee.

DAY, J. This is an appeal from a judgment entered July 14, 1975, admitting the will of Samuel Kamesar, deceased, to probate over objections alleging that it was executed as a result of undue influence.

*Facts.*

Samuel Kamesar died on January 16, 1974, at the age of eighty-four years. He was survived by two daughters, Jeanette Feldman and Bernice Lee, a son, Armon Kamesar, and his second wife, Doris Kamesar, to whom he had been married three years.

During the seven years prior to his death, the deceased executed four wills. The first was executed on January 23, 1967 leaving the major portion of his estate to his first wife, Rose. In the event his wife predeceased him, he left $10,000 to a grandson, Richard Feldman, and $5,000 each to his other grandchildren. If his children became beneficiaries, they were treated equally.

The second will was executed March 10, 1969, following the death of his first wife. It gave $10,000 to his grandson, Richard Feldman and $5,000 each to his other grandchildren. It left $6,000 to various charities, divided the residue equally between his children and named them and a corporate fiduciary as co-executors.

The third will executed on March 2, 1971 was drafted because of a reduction in the value of the testator's holdings. It eliminated the corporate fiduciary and the charitable gifts, but the remaining provisions were the same as the 1969 will.

On March 28, 1971, Samuel Kamesar married Doris Kamesar. On June 18, 1971, he executed a fourth will which is the subject of this appeal. This will incorpo-

rated the terms of a pre-nuptial agreement. It left $5,000 to Richard Feldman and nothing to the other grandchildren. The will named Bernice Lee as sole executor and left to her the remainder of his estate. The will left nothing to Jeanette Feldman or Armon Kamesar and contained the following statement:

"I make no other provisions herein for my daughter, Jeanette, or my son, Armon, because I have made special provisions for them during my lifetime, making it unnecessary to do so in this will."

The June 1971 will was propounded by Bernice Lee as the last will and testament of the deceased. It was objected to by Armon Kamesar and Jeanette Feldman on the ground it was the result of undue influence by Bernice Lee. In turn, the objectors offered the March 1971 will as the last will of the deceased.

At the time of his death in 1974, Samuel Kamesar suffered from cerebral arteriosclerosis and cancer. One of the physician's who treated him, Dr. Jay S. Goodman, testified the arteriosclerotic condition began years before but he could not state when. Armon Kamesar testified his father became a little forgetful as early as 1967. Several of the deceased's friends and relatives stated he was forgetful, especially of recent events, and confused in June 1971, the time when the will in question was executed.

However, all witnesses except Armon Kamesar, testified he was of sound mind when he remarried in March 1971. His wife, Doris, testified he was forgetful when they were married but always knew what he owned and who his children were. Armon testified that while he doubted his father's mental capacity at the time of the March 1971 will, the pre-nuptial agreement and marriage, he never expressed such doubts because he approved of what was done. Dr. Goodman testified that by the last half of 1973, when the decedent entered the hospital,

until his death in 1974 the decedent lacked the ability to make a decision.

Samuel Kamesar resided in Milwaukee most of his adult life. For many years he was in the meat packing business, and Armon Kamesar was also active in the management of the business until it terminated in 1960. Jeanette Feldman has lived in California with her husband and children since 1965 and received substantial financial support from her parents, particularly in the early years of her marriage. Armon Kamesar also lives in California with his family. Until 1971, Armon lived in Milwaukee and managed his father's financial affairs. He had a power of attorney from his father that was never revoked. He collected his father's rents, paid the bills, reviewed his taxes and managed his father's investments. He participated in this father's estate planning and knew the contents of the first three wills.

Armon testified he received between $80,000 and $90,000 in gifts from his parents. $50,000 of this amount represented forgiveness of a debt incurred when Armon attempted to return to the meat packing business in 1961. Bernice Lee lived abroad with her children for several years and returned to Milwaukee prior to her mother's death in 1968. When Armon left Milwaukee in 1971, Bernice collected her father's rents, paid his bills and handled his checking account. She managed his investments and communicated with his accountant and his attorney. She also possessed a power of attorney executed by her father in March 1971.

The record does not show any gifts to Bernice Lee or her family until after execution of the June 1971 will. The record shows that Samuel Kamesar gave $3,000 each to Bernice Lee and her two children in the years 1971 thru 1974 inclusive. They were paid by check drawn by Bernice Lee on her father's account. On December 26, 1973, twenty-one days before his death, Samuel Kamesar executed a document setting up a gift program in favor

of Bernice Lee and her children of $9,000 in tax free gifts per year.

While the record shows that there was much ill feeling between Bernice and her brother and sister, it seems clear that Samuel Kamesar had equal affection for all of them.

All of the wills were drawn by the deceased's lifetime friend and attorney, Mr. George Laikin. Mr. Laikin testified that on March 18, 1971, when Samuel Kamesar and Doris Kamesar executed the pre-nuptial agreement, Mr. Laikin recommended that Mr. Kamesar amend his will to incorporate the terms of the agreement. Mr. Kamesar told him that "other changes" should be made in the will also and that he would advise him of those changes later. Mr. Laikin testified that Mr. Kamesar did not personally contact him but communicated the changes to be made in the will by telephone through Bernice Lee. Mr. Laikin stated that Mr. Kamesar customarily communicated with him in that manner, first through Armon and later through Bernice.

When the June will was ready to sign, Bernice Lee made an appointment with Mr. Laikin and drove Samuel and Doris Kamesar to his office. Doris Kamesar and Bernice Lee were present when the will was executed. Mr. Laikin and Bernice Lee both testified that Mr. Laikin reviewed the specific terms of the will. Bernice Lee testified Mr. Laikin asked her to go through the terms again with her father and she read it to him. She testified Mr. Laikin told her father that the will would make some people unhappy but her father replied that one has to take a chance in life. Doris Kamesar testified that Mr. Laikin did not review the will but merely gave it to Samuel Kamesar to read and asked him if he understood it. She and Mr. Laikin testified Samuel Kamesar did ask to have the will changed to provide that his wife could remain in the apartment for one year after his death instead of six months.

Mr. Laikin testified that Samuel Kamesar said the will was what they had talked about and said, "let's proceed to sign the will." Mr. Laikin also testified he questioned Samuel Kamesar whether he knew this will left all to Bernice and he said he did. Mr. Laikin believed Samuel Kamesar was competent at the time and not under any undue influence.

Doris testified that some months after the will was signed, when she reminded Samuel Kamesar that he had cut his two children out of the will, he could not remember doing so.

When Bernice Lee offered the June 1971 will for probate, Armon Kamesar and Jeanette Feldman objected, claiming the will was the result of undue influence by Bernice Lee upon her father. The trial court conducted a hearing on the issue and found in favor of Bernice Lee and ordered the June 1971 will admitted to probate.

*Issues*

There are two avenues by which an objector to a will on the theory of undue influence may challenge its admission.

One is by proving the elements that this court has said show undue influence. Those are: (1) susceptibility to undue influence, (2) opportunity to influence, (3) disposition to influence, and (4) coveted result. *In Matter of Estate of Becker,* 76 Wis.2d 336, 347, 251 N.W.2d 431 (1977); *Estate of Hamm,* 67 Wis.2d 279, 283, 227 N.W.2d 34 (1975); *Estate of Von Ruden,* 55 Wis.2d 365, 373, 198 N.W.2d 583 (1972). The burden is on the objector to prove by clear, satisfactory and convincing evidence that the will was the result of undue influence. However, when three of the four elements have been established by the required quantum of proof, only slight evidence of the fourth is required. *Will of Freitag,* 9

Wis.2d 315, 318, 101 N.W.2d 108 (1960); *Estate of Brehmer*, 41 Wis.2d 349, 352, 164 N.W.2d 318 (1969); *Estate of McGonigal*, 46 Wis.2d 205, 209, 174 N.W.2d 256 (1970).

The second method of challenge is to prove the existence of (1) a confidential relationship between the testator and the favored beneficiary and (2) suspicious circumstances surrounding the making of the will. *Will of Faulks*, 246 Wis. 319, 360, 17 N.W.2d 423 (1945); *Will of Cooper*, 28 Wis.2d 391, 395, 137 N.W.2d 93 (1965); *Estate of Hamm*, 67 Wis.2d at 294.

### I. *Four Elements Test.*

### A. *Susceptibility To Undue Influence.*

The objectors must establish by clear, satisfactory and convincing evidence that the testator in this case was susceptible to the influence of Bernice Lee. Factors to be considered are age, personality, physical and mental health and ability to handle business affairs. *Estate of McGonigal*, 46 Wis.2d at 213; *Estate of Hamm*, 67 Wis.2d at 288, 289. This court has stated that the infirmities of old age, such as forgetfulness do not incapacitate one from making a valid will. *Estate of Phillips*, 15 Wis.2d 226, 231, 112 N.W.2d 591 (1961). The objectors here cite *Estate of Larsen*, 7 Wis.2d 263, 272, 96 N.W.2d 489 (1959) for the proposition that evidence of impaired mental powers on the part of a testator is itself a circumstance which gives rise to a reasonable inference that the testator is susceptible to undue influence. However in *Larsen*, a testator described as "senile" also had periods of lucidity and this court also said:

"While we would have had no difficulty in affirming a determination by the trial court that the transfer was made as the result of undue influence, we are not prepared to hold that the finding of the trial court, that Minnie was not susceptible to undue influence at the time she made the transfer, together with the ultimate finding that such transfer was not the result of undue influence, are against the great weight and clear preponderance of the evidence. A finding of fact of a trial court made upon conflicting evidence should not be set aside on review if a judicial mind could, on due consideration of the evidence as a whole, reasonably have reached the conclusion of the court below." *Id.* at 273, 274.

The objectors argue that the fact that Samuel Kamesar entrusted the management of his business affairs to Bernice, coupled with his impaired mental powers, made him susceptible to her influence. But the evidence is conflicting. The testator did suffer from arteriosclerosis, and there was testimony that in June of 1971 he was forgetful and confused. But several witnesses testified he was of sound mind three months before when he was married, and his wife testified he never forgot what he owned or who his children were. Mr. Laikin, the attorney, who was present when all the wills were executed and had known the testator for most of his own life, testified that the deceased was of sound mind and not under any undue influence when the will in question was executed. At that conference the testator made one request for a change with regard to his wife's occupancy of the apartment in the event of his death. This request shows his awareness of the will's provisions. The trial court's conclusion that the objectors did not establish susceptibility is not against the great weight and clear preponderance of the evidence.

### B. *Opportunity To Influence.*

The trial court found and the proponents agree that Bernice Lee had ample opportunity to exert undue influence on the decedent. This conclusion is not against the great weight of the evidence.

### C. *Disposition To Influence.*

Disposition to unduly influence means more than a desire to obtain a share of the estate. It implies a willingness to do something wrong or unfair. *In Matter of Estate of Becker,* 76 Wis.2d at 350; *Estate of Hamm,* 67 Wis.2d at 289, 290; *Estate of Brehmer,* 41 Wis.2d at 356; *Estate of McGonigal,* 46 Wis.2d at 214.

The evidence in this case shows that Bernice Lee had taken over the decedent's business affairs completely, but as the trial court pointed out, she had merely taken up where her brother had left off when he moved from Milwaukee. Bernice Lee testified that in December 1973, she did consult another attorney other than Mr. Laikin and procured a declaration of intent signed by her father to give her and her children $9,000 in tax free gifts every year. This document was executed twenty-one days before Samuel Kamesar died, at a time when his attending physician testified that he was incapable of making any kind of decision. But this was remote in time from the date of execution of the will in question here.

In the *Will of Raasch,* 230 Wis. 548, 284 N.W. 571 (1939), evidence of a nephew's disposition to influence the testator was based on evidence of overreaching which occurred subsequent to the execution of the will. However, in the *Raasch* case, the nephew had tried to induce the testator to eliminate a provision for a niece in the very presence of the drafter of the will. There

were also a number of assignments that the nephew had procured of property belonging to the testator. The evidence in *Raasch* was such that the trial court characterized the nephew's activities as follows: "to our mind, this conclusively shows that (the nephew) was disposed to use whatever means were at hand to acquire the testator's property." *Raasch,* page 555.

In the case before us, the trial court did not so find, nor are the facts in the two cases sufficiently similar that the conclusion in the *Raasch* case must follow in the case at bar. The evidence here is quite clear that Armon Kamesar and Jeanette Feldman received substantial gifts from their parents during the parents' lives and that Bernice Lee had not. Even if she had tried to influence her father to make his will more favorable to her than to her brother and sister who had already benefitted from Samuel Kamesar's generosity, such influence would not necessarily be undue. In the *Estate of Brehmer,* 41 Wis.2d at 356, where the decedent's daughter convinced him that his earlier will was unfair to her, this court said that nothing in the record supported a finding that the daughter was disposed to influence her father for the purpose of procuring an improper favor. The trial court's finding in favor of Bernice Lee on this issue is not against the great weight and clear preponderance of the evidence.

### D.   *Coveted Result.*

This element goes to the naturalness or expectedness of the bequest. *Estate of Steffke,* 48 Wis.2d 45, 49, 179 N.W.2d 846 (1970) ; *Estate of Hamm,* 67 Wis.2d at 291, 292. The fact that the testator has excluded a natural object of his bounty is a "red flag of warning." *Estate of Culver,* 22 Wis.2d 665, 673, 126 N.W.2d 536 (1964). But that fact alone does not render the disposition un-

natural where a record shows reasons as to why a testa-
tor would leave out those who may be the natural bene-
ficiaries of his bounty. *Will of Faulks,* 246 Wis. at
363-6; *Will of Cooper,* 28 Wis.2d 391, 137 N.W.2d 93
(1965); *Estate of Brehmer,* 41 Wis.2d at 356.

In the case at bar, the will expressly states that Armon
Kamesar and Jeanette Feldman are excluded because
the testator believed he had adequately provided for them
during his lifetime. Mr. Laikin testified that it was he
who suggested that this language be used in drafting the
will and further testified:

"Q. Did Mr. Kamesar direct that particular language
be used?
"A. I think he wanted an expression in the will which
would indicate why it was being done this way.
"Q. And did he manifest his desire to have that
language in the will through Bernice Lee?
"A. I think that was discussed in person and—
"Q. When?
"A. I can't be sure whether it was in March or in
some other contact. I have no recollection of having
discussed this directly with Bernice Lee. It was not on
the note there. So at some point Sam Kamesar must have
indicated to me that he wanted an expression.
"Q. And he would have indicated that to you at the
March 18th meeting—
"A. Yes.
"Q. —that would be one of the things you don't recall
him getting back to you personally on, is that right?
"A. Must have gotten—it must have been settled be-
cause here it is. And it was gone into at the time the will
was signed."

While conflicting inferences may be drawn from the
evidence presented and even though the June 1971 will
manifests a drastic change in attitude from that mani-
fested just three months before when Armon Kamesar
had been the close confidant of his father, the trial
court's finding in favor of the proponent on this issue is

not against the great weight and clear preponderance of the evidence.

We conclude, therefore, that on the basis of the four classic elements the trial court must be sustained.

II. *Was The Trial Court's Refusal To Raise A Presumption Of Undue Influence Contrary To The Great Weight And Clear Preponderance Of The Evidence?*

Undue influence may also be proved by the existence of (1) a confidential relationship between the testator and the favored beneficiary, and (2) suspicious circumstances surrounding the making of the will. *Will of Faulks, supra; Will of Cooper, supra; Estate of Hamm, supra.* When the objector proves the existence of both elements by the required quantum of evidence, a presumption of undue influence is raised, which must be rebutted by the proponent. The trial court held that the record did not substantiate a finding of either element.

### (1) *Confidential Relationship.*

This court has described the confidential relationship that is sufficient to raise a presumption of undue influence as follows:

"The basis for the undue influence presumption lies in the ease in which a confidant can dictate the contents and control or influence the drafting of such a will either as the draftsman or in procuring the drafting. . . . If one is not the actual draftsman or the procurer of the drafting, the relationship must be such that the testator depends upon the advice of the confidant in relation to the subject matter of the will. . . ." *Estate of Steffke,* 48 Wis.2d at 51, quoted in *Estate of Velk,* 53 Wis.2d 500, 507, 192 N.W.2d 844 (1972).

The objectors argue that Bernice Lee's role in the execution of the June 1971 will made her the procurer of the drafting and execution of the will. To "procure" is "to initiate," "to instigate," or "to cause a thing to be done." Black's Law Dictionary, (1968) page 1373. However, the record shows that it was Mr. Laikin who recommended that Samuel Kamesar change his will to reflect the provisions of the pre-nuptial agreement. Samuel Kamesar himself stated that he intended to make "other changes" as well. Bernice Lee's role in communicating these changes to Mr. Laikin and in arranging for the execution of the will was a role customarily played by one of Samuel Kamesar's children.

The record is clear, however, that Bernice Lee did manage all of her father's business and personal affairs, and this court has held that where a child has also served as a testator's financial advisor that a confidential relationship can be found to exist. *Will of Raasch, supra.*

In the case of *In re Estate of Malnar,* 73 Wis.2d 192, 243 N.W.2d 435 (1976), this court affirmed a trial court determination that Genevieve Malnar, a relative by marriage of the testatrix, unduly influenced the testatrix to execute a will leaving all of her property to Genevieve Malnar. This court concluded that the objector met its burden of proof under the confidential relationship and suspicious circumstances test. The court held that a confidential relationship existed by virtue of a power of attorney conferred by the testatrix on Genevieve and the role that Genevieve Malnar played in managing the testatrix's affairs. The court pointed out that the testatrix relied heavily on Genevieve Malnar for transportation, maintaining her household, assisting her in taking medication, making translation for her since the testatrix spoke very little English and assisting her in her financial matters. The court concluded that these factors indicated the presence of a confidential relationship.

The close similarity between the services performed for the testatrix in the *Malnar* case and those performed by Bernice Lee for the testator in this case establish the existence of a confidential relationship. Armon Kamesar testified that when he managed his father's affairs he also took an active part in the estate planning. Bernice Lee testified that she took over the role that had previously been played by her brother and it appears to us that the reasonable inference to be drawn from the evidence is that Samuel Kamesar did rely on Bernice Lee in relation to the subject matter of the will. We conclude, therefore, the finding of the trial court, that there was no confidential relationship between Bernice Lee and her father is against the great weight and clear preponderance of the evidence.

### (2) *Suspicious Circumstances.*

The suspect circumstances requirement is satisfied by proof of facts "such as the activity of the beneficiary in procuring the drafting and execution of the will, or a sudden and unexplained change in the attitude of the testator, or some other persuasive circumstance." *Will of Faulks,* 246 Wis. at 360; *Estate of Hamm,* 67 Wis.2d at 294. "The basic question to be determined from the evidence is always whether 'the free agency of the testator has been destroyed.'" *Estate of Hamm, Id.* at 294, 295.

In *Malnar,* 73 Wis.2d at 203, 204, the court found that the following evidence supported a conclusion of suspicious circumstances surrounding the making of the will. Genevieve Malnar had called an attorney and asked him to draft the will. The attorney visited the testatrix, who was bed-ridden, in a nursing home. Because she spoke little English, the attorney realized that she did not understand him and Genevieve acted as a translator

in communicating to him the terms of the will. When he brought the draft to the testatrix to sign, she was too weak to sit up by herself. Genevieve Malnar propped the testatrix up with pillows, and the testatrix was so weak that she could only sign by using an "x." The attorney who drafted the will was not the testatrix's personal attorney but was Genevieve Malnar's mother's attorney. Nothing in the evidence explained the sudden change in attitude expressed by the testatrix in the will made three years earlier in which she bequeathed her entire estate to her nieces, nephews and charity. The evidence showed the will was made in haste and that the testatrix showed reluctance in making the will, had at first refused to do so and then suddenly, without explanation, changed her mind. None of the nieces and nephews knew about her serious medical condition or her desire to change her will.

In contrast, in the case at bar, although Bernice Lee called the attorney, Mr. Laikin, made the appointment to see him to have the will signed, drove Samuel Kamesar to the lawyer's office and communicated to the attorney the terms of the will which made her the sole beneficiary, these were all routine practices for this particular testator. The evidence showed that at the time of execution, Samuel Kamesar was aware of the terms of his will. The will was also drafted by his long-time personal friend and attorney who testified there was nothing irregular in the drafting or in the execution. The will itself contained the explanation that Samuel Kamesar believed that he had adequately provided for his son and his other daughter during their lifetime, and the fact was that they had received substantial gifts and that Bernice Lee had not received such gifts. The will was not made in haste but over a period of three months. There was no reluctance shown in signing the will and while the testator was forgetful, he was func-

tioning on his own, outside of a nursing home when the will was executed. It was also established that Armon Kamesar had been informed by Doris Kamesar of the new will before his father died and all parties were aware of the testator's failing health. The differences in the proof of suspicious circumstances in the case of *Malnar* and the one before us support the court's conclusion that no suspicious circumstances were proven. That conclusion is not against the great weight and clear preponderance of the evidence. See also: *In Matter of Estate of Becker, supra.*

### III.    *Did The Trial Court Err In Rerfusing To Permit Surrebuttal?*

On rebuttal Bernice Lee testified that on the way home from Mr. Laikin's office, Doris Kamesar asked Samuel Kamesar if the new will satisfied him and he responded, "Yes, very." Bernice also testified that subsequently in 1973, after a visit by Jeanette Feldman, Samuel Kamesar told Doris that, "She's (Jeanette) gotten all that she's going to get." The trial court refused to permit the objectors to surrebut this testimony. By offer of proof, the objectors showed that if permitted to surrebut, they would have recalled Doris Kamesar, who would have testified that none of these incidents took place.

Surrebuttal is proper when facts are introduced for the first time on rebuttal. *Anderson v. Anderson,* 136 Wis. 328, 331, 117 N.W. 801 (1908) ; *McGowan v. Chicago & Northwestern R. Co.,* 91 Wis. 147, 154, 64 N.W. 891 (1895). *See generally:* 75 Am. Jur.2d, *Trial,* sec. 152 (1974). The trial court's conclusion that this rule does not apply to a will contest case was based on a description in J. MacDonald, *Wisconsin Probate Law And Practice,* sec. 6.120 (7th Ed. 1972), of the usual

order of proof. According to MacDonald, the order of proof is: (1) Formal proof of execution of a valid will; (2) presentation of the whole of the contestant's case; and (3) extensive rebuttal by the proponent. MacDonald approves of permitting extensive rebuttal by the proponent because the primary burden of proof in such a case is actually on the contestant. However, neither MacDonald nor the single Wisconsin case cited by MacDonald, *Will of Faulks, supra,* discusses surrebuttal. Neither MacDonald nor this case state that if new facts are adduced on rebuttal, the contestant is not entitled to rebut them.

Though we conclude that the trial court erred in not permitting this rebuttal, we conclude the error was harmless because had the rebuttal been given, it would not have changed the results on the issue of undue influence. There was sufficient evidence in the record even if the proffered rebuttal testimony were accepted supporting the trial court's conclusion that the will of Samuel Kamesar was not the result of undue influence.

*By the Court.*—Judgment affirmed.